R. Waldron Herzberg, J.
The plaintiff corporations (Sterling), corporate employers of duly licensed optometrists and registered ophthalmic dispensers, instituted this action on or about September 26, 1963, to have declared unconstitutional, illegal and unenforeible paragraphs i, k and l of subdivision 1 of section 70 and paragraphs c, d and e of subdivision 1 of section 76 of the Regulations of the Commissioner of Education of the State of New York. (8 NYCRR 66.1 [a] [9] [11] [12]; 67.1 [a] [3] [4] [5].) The defendants are the State administrative bodies which have either promulgated the regulations under attack or are charged with their enforcement. The intervenordefendants (Intervenors), who are duly licensed optometrists, were permitted to intervene in this action by an order of this court. In addition, this court allowed the New York State Optical Retailers Association, Inc., the United Optical Workers Union, Local 408, IUE AFL-CIO (Union), Colston Optical of New York, Inc., and the New York State Optometrie Association (NYSOA) to appear as amici curiae. At the commencement of this action this court granted an order restraining defendants during its pendency from enforcing these regulations. This temporary injunction is still in effect.
The regulations under attack prescribe certain conduct on the part of optometrists and ophthalmic dispensers. The Education Law in article 143 (§§ 7101, 7120) defines the practice of optometry and ophthalmic dispensing as follows:
“ § 7101. Definition. A person practices optometry within the meaning of this article who, by any means of methods, other *855 than by the nse of drags, diagnoses any optical deficiency or deformity,' visual or muscular anomaly of the human eye, or prescribes, provides, furnishes or adapts lenses, prisms or ocular exercises, also termed, orthoptics, visual training, or eye training, for the aid, correction or relief of the same, or who holds himself out as being able to do so.”
“ § 7120. Definition. A person practices ophthalmic dispensing within the meaning of the provisions of this article relating to ophthalmic dispensing who prepares and dispenses lenses, spectacles, eyeglasses and/or appurtenances thereto to the intended wearers thereof on written prescriptions from physicians or optometrists duly licensed to practice their profession, and in accordance with such prescriptions interprets, measures, adapts, fits and adjusts such lenses, spectacles, eyeglasses and/or appurtenances thereto to the human face for the aid or correction of visual or ocular anomalies of the human eyes. The services and appliances relating to ophthalmic dispensing shall be dispensed, furnished or supplied to the intended wearer or user thereof only upon prescription issued by a physician or optometrist; but duplications, replacements, reproductions or repetitions may be done without prescription, in which event any such act shall be construed to be ophthalmic dispensing the same as if performed on the basis of an original written prescription.”
At the present time, although there are several schools of optometry in sister States, there is none in New York State. The only school of ophthalmic dispensing located in this State is the Brie County Technical Institute in Brie County.
The regulations at issue as they relate to optometry are found in paragraphs i, h and l of subdivision 1 of section 70 (art. VIII) of the Regulations of the Commissioner of Education (8 NYCRR 66.1 [a] [9] [11] [12]) and read as follows:
“ Sec. 70. 1. i. advertising by displaying any spectacles, eyeglasses, or spectacle frames or mountings, goggles, sunglasses, lenses, prisms, spectacle or eyeglass cases, ophthalmic materials, optometric instruments, diagnostic devices, optical tools or machinery, or any merchandise, material or advertising in office windows or reception rooms or in display cases outside of the office, whenever the display of such merchandise, material or advertising would make it visible from the street or the public corridor of a building.
‘1 k. advertising, either directly or indirectly, the performance of optometric services or any part thereof, including the furnishing of ophthalmic or optical material, except that if an optometrist opens an office or removes from an old to a new office, such *856 information may be contained in a letter and may be published in a newspaper in a box not larger than 4 inches in width and 2 inches in height, the information therein in either case, to be limited to the statement of opening or removal of office, the name, professional degree, address, telephone number, office hours and not more than one specialty, which advertisement may be published for a total period of not more than two weeks [Paragraph h added March 1, 1963]. Provided, however, that the foregoing shall not prevent the following:
“ (1) the use by an optometrist of a professional card containing his name, address, telephone number, special field of practice, if any;
“ (2) the use by an optometrist at his place of practice of not more than five signs not larger than the size specified in paragraph g of this subdivision, showing the name of the practitioner, his specialty, if any, or the words eyes examined, ’ ‘ prescriptions filled, ’ or ‘ contact lenses ’;
“ (3) the use by an optometrist of a recall notice to patients of record provided such card contains no solicitation;
“ (4) the printing of the practitioner’s name, address and telephone number on eyeglass cases or eyeglass cleaners;
“ (5) listings in directories, restricted to name, title, address and telephone number of the person or firm, not appearing in bold -type, boxes, or other style which differentiates them from the majority of the other names in the same list;
“ (6) listings of the name of the practitioner on the directory of the building in which the office is located [Language beginning ‘ provided, however ’ added May 26, 1967, effective June 14, 1967].
“ 1. aiding or abetting, either directly or indirectly, in the conduct or advertising of any employer, firm or associate if such conduct or advertising conflicts with the foregoing regulations; or continuing the practice of optometry with any such employer, firm or associate after the optometrist has received written notice from the Board of Examiners or from the department of such conduct or advertising by the employer, firm or associate [Paragraph l formerly j, renumbered March 1,1963]. The notice shall state the specific violation or violations alleged on the part of such employer, firm or associate and shall fix a date for a preliminary hearing pursuant to section 7108 of the Education Law, at which time the optometrist and his employer shall be heard and shall have the right to representation by counsel [Last sentence added May 26, 1967].” The Education Law provides that a violation of these regulations constitutes a misdemeanor:
*857 ‘ ‘ § 7111 * * * 4. Any violation of the provisions of part one* of this article shall be a misdemeanor and courts of special sessions shall have jurisdiction of all such violations, and any person violating any of the provisions of part one * of this article or any rule of the department relating to the practice of optometry and not inconsistent with law shall be guilty of a misdemeanor and shall on conviction thereof be punished for a first offense by a fine of not less than fifty dollars nor more than two hundred fifty dollars, or by imprisonment for not more than three months, or by both such fine and imprisonment, and for a second or subsequent offense by a fine of not less than two hundred fifty dollars nor more than five hundred dollars, or by imprisonment for not more than six months, or by both such fine and imprisonment. Each act constituting a violation of part one * of this article shall be deemed to be a separate act, and the person guilty thereof shall be subject to a penalty of one hundred dollars for each such act.”
The regulations at issue as they relate to ophthalmic dispensing are found in paragraphs c, cl and e of subdivision 1 of section 76 (art. VIII-A) of the Regulations of the Commissioner of Education (8NYCRR67.1 [a] [3] [4] [5]) and read as follows: “ Sec. 76. 1. c. advertising of any character which includes or contains any price whatsoever or any reference thereto, or any reference to cost whether related to service or material, and notwithstanding the same may be neither fraudulent nor deceitful, shall be and is unprofessional conduct in the practice of ophthalmic dispensing [Paragraph c added September 30, I960].
11 d. advertising gratuitous services, bonuses, premiums, discounts, or any other inducements.
“ e. aiding or abetting, either directly or indirectly, in the conduct or advertising of any employer, firm or associate if such conduct or advertising conflicts with the foregoing regulations ; or continuing the practice of ophthalmic dispensing with any such employer, firm or associate after the ophthalmic dispenser has received written notice from the board or the department of such conduct or advertising by the firm or associate.” The plaintiff corporations were organized under New York law: Sterling Optical Co., Inc., incorporated in 1914, operates a store at 138 Fulton Street in New York City; Sterling Optical Co., Hempstead, Inc., incorporated in 1959, operates a store in West Hempstead, Long Island; Sterling Optical Co., Westchester, incorporated in 1960, operates a store at Cross-County Shopping Center in Yonkers; and Sterling Optical Co., Broad *858 way, Inc., incorporated in 1962, operates a store at 1296 Broadway in New York City. Since the commencement of this action in September 1963 Sterling has incorporated five companies to operate stores in White Plains, Albany, Poughkeepsie, Kingston, and Huntington in New York State.
In December, 1960 Mr.. Justice Tilzeb in his opinion at Special Term in People v. Sterling Optical Co. (26 Misc 2d 412, 413-414, affd. 14 A D 2d 838, affd. 11 N Y 2d 970), described the activities of Sterling as follows: “ The defendant [Sterling] maintains a store where it has a large stock of eyeglass frames and eyeglass lenses. It employs optometrists on a salary basis, whose functions are to examine the eyes of customers in order to determine whether such customers need eyeglasses at all, and, if so, what type of optical lens is required. In making the examination, the optometrist uses whatever optical instruments are necessary in the particular case, which instruments are owned by the defendant. The optometrist sets out the particular optical properties of the lens required on a document commonly called a 1 prescription ’. The customer is instructed to take such prescription to another part of the defendant’s establishment where he or she chooses a frame, after which a duly licensed ophthalmic dispenser, also employed by defendant on a salary basis, sees that lenses of optical qualities to conform to the optometrist’s prescription are inserted, and that the frame with the lenses so inserted is properly adapted to the customer’s face. The lenses of the required optical properties are cut to fit the shape of the frame. If the customer desires to purchase the frame or lens separately, he may do so.”
Sterling conducts its business solely pursuant to the provisions of section 7109 of the Education Law, which permits a corporation to employ duly licensed and registered optometrists for the purpose of examining the eyes of customers in conjunction with the retail sale of corrective eyeglasses, to determine the need for eyeglasses and, where appropriate to issue written prescriptions, to meet such needs. The corporation may also employ duly certified and registered ophthalmic dispensers to dispense corrective eyeglasses on written prescriptions from physicians or optometrists, including those optometrists employed by the corporation, and to measure, fit and adjust such corrective eyeglasses to customers in accordance with such prescriptions.
The Legislature, in enacting this section of the Education Law, permitted Sterling and other similarly situated employers to engage the services of 11 licensed optometrists for the limited purpose of examining the eyes of its customers in connection *859 with the sale of eyeglasses at retail and for this purpose to utilize their skill to determine the need for glasses and the prescription to meet any such need ” (People v. Sterling Optical Co., supra, p. 421; emphasis added). The NYSOA through Harold Kohn, their attorney, agrees in his brief ‘ ‘ that this is the extent of his activity (an employed optometrist) because the decision (People v. Sterling, supra) itself affirmed without opinion by higher courts limits his activities. ’ ’
Moreover, the Legislature, when it enacted section 7109 of the Education Law in 1928, believed this statute would be an aid to public health; the courts have held it to be constitutional because of its relation to public health; and further, the courts have construed that the benefits to be received were intended for the public, not the optometrist. Otherwise, the statute would have been unconstitutional (Matter of Dickson v. Flynn, 246 App.Div. 341, 343-344 [3d Dept., 1936], affd. 273 N. Y. 72).
Since incorporation Sterling has prospered and in turn expanded its operations. More than 100,000 eye examinations a year are conducted by its licensed optometrists; more than 1,000,000 pairs of eyeglasses have been dispensed since 1959; at present the annual payroll exceeds $1,000,000, including the salaries of 28 licensed optometrists and 38 ophthalmic dispensers. Approximately 20% of the eyeglasses dispensed are based upon prescriptions written by ophthalmologists; 25-30% of the prescriptions filled are duplications of eyeglasses already in use by customers; and finally, the cost to the public for single vision eyeglasses with frame is less than $10, in contrast to the more than $20 charged by privately practicing optometrists.
Mr. Justice Tilzeb in People v. Sterling Optical Co. (supra, pp. 420-421), wrote in 1960 relative to the conduct of Sterling’s business: ‘1 The circumstance that the defendant has been successful in its business may be said to indicate that in fact the public is being better served. Indeed, although the corporate employment of optometrists has existed for over half a century in this State, no instance has been cited where such employment caused injury to the public.” Now, ,seven years later, no instance has been called to the attention of this court of any disciplinary proceeding taken by defendants or any agency vested with disciplinary powers against any employee optometrist of Sterling for either an improper eye examination or malpractice in prescribing lenses for eyeglasses.
In the conduct of its business Sterling advertises the availability of its optical merchandise on radio and television, in newspapers and organizational publications, in the classified telephone directories, and by direct mailing to customers. Although *860 displaying optical merchandise and informational signs in its store windows, Sterling neither engages in price advertising, nor permits its employee-optometrists to advertise.
In addition to Sterling, there are some 200 to 300 retail sellers of eyeglasses, including department stores such as Macy’s, Gimbels, Bloomingdale’s and Gertz, with 300 to 400 outlets in New York State employing approximately 400 licensed optometrists. E. J. Korvette and Sears, Roebuck & Co. dispense eyeglasses at retail through departments leased to optical companies which employ optometrists. These corporations likewise follow the accepted practice of displaying in their store windows spectacles, frames, eyeglass cases and informational signs, such as ‘ ‘ eyes examined, ” “ prescriptions filled, ’ ’ and ‘1 contact lenses, ’ ’ and advertising on television, radio, and in newspapers in a manner similar to that employed by Sterling.
During the trial a representative of the United Optical Workers Union, Local 408, TUB, AFL-CIO (an amicus curicc in this action) testified that there are approximately 175 optometrists and 400 ophthalmic dispensers in this State who are members of this Union; that as a result of bargaining agreements between employers and this Union, the optometrists and ophthalmic dispensers now enjoy a minimum wage scale, paid vacations, a health and welfare plan, seniority rights and in some instances pension rights in a plan solely financed by the employer.
Finally, in identifying the activities of Sterling and its relationship with one segment of the public, the court refers to the testimony of Louis Rolnick, Director of the Welfare and Health Benefits Department of the International Ladies Garment Workers Union and Administrator of the National Retirement Fund and National Severance Fund. Mr. Rolnick testified that approximately 200,000 union members for many years have had their eye care and eyeglass needs satisfactorily and economically provided by corporate retail sellers of eyeglasses, such as Sterling. Furthermore, in his opinion not only is there no relationship between the quality of optical care and services, whether or not advertising was utilized, but also in his opinion truthful advertising and a display of optometric materials are a benefit to the public.
Milton Marcus, Harold Friedman, William Ludlum, Herbert Ueberall and Ira Bernstein, privately practicing optometrists in the Metropolitan area of New York City and active members in the NYSOA, intervened in this action so that their interests and all other persons similarly situated would be protected. Although they did not testify upon the trial, the testimony they gave at examinations before trial was read into the record.
*861 The testimony of the Interveners indicates the bitter conflict which has existed for many years between the privately practicing optometrists on one hand and the corporate employers of optometrists on the other. The former contend that neither is it within the accepted standards of professional conduct for optometrists to be employed by a commercial establishment or by an individual not an optometrist, nor is it professional for an optometrist to be employed by an optician who sells glasses for the purpose of examining eyes in connection with such sales or in connection with the dispensing of glasses by such an optician, an exception to this being an optometrist employed by a hospital, clinic or nonprofit organization.
In their testimony the Interveners appeared deeply concerned with the effect of advertising upon their profession. They expressed fears that advertising would cast the practitioner in the image of a merchant rather than a professional man, resulting in a deterioration of the relationship between optometrist and patient.
An analysis of the Intervenors ’ testimony discloses that each dispenses eyeglasses, charges for eye examinations and derives more than one half of his income from the sale of merchandise; i.e., the dispensing of lenses and frames. The Intervenor Dr. Ueberall testified that he charges a patient a minimum of $23 for an examination of the eyes and the dispensing of a pair of single vision lenses and frames. Witnesses called by the Intervenors testified that they had purchased similar eyeglasses and frames at Sterling for less than $10.
Although the New York State Optometric Association (NYSOA) is not a party to this action, but an amicus curim, their efforts in obtaining the promulgation of the regulations at issue requires a discussion of the composition of their membership, their declared policy toward Sterling and other similar employers of optometrists, the steps taken to carry out their declared policy, and their formation of the New York State Vision Services, Inc.
The NYSOA is a private membership corporation with a membership of approximately 920 licensed optometrists. Since this professional society regards optometrists who work for corporations such as Sterling or lay retail sellers of eyeglasses unprofessional, such optometrists are ineligible for membership. This policy of exclusion extends to the local optometric societies and the American Optometric Association — the national organization. On the other hand, the NYSOA welcomes into its fold optometrists who are employed to examine eyes and dispense eyeglasses by corporations such as Sperry-Band and American *862 Optical Company, or by labor unions or by their affiliate (discussed infra), the New York State Vision Services, Inc.
The declared policy of the NYSOA for many years, manifested in the Journal of the association, has been to seek the elimination of corporate practice and ‘ ‘ that any and all steps be taken to this end.” In pursuance of this policy the NYSOA has sponsored almost yearly legislation to prohibit the corporate employment of optometrists; i.e., the repeal of section 7109 of the Education Law. During the trial of this action the NYSOA sponsored legislation (Sen. Int., 3335), vetoed by Governor Rockefeller on May 2, 1967, to accomplish this purpose. In his veto message Governor Rockefeller wrote in part: ‘ ‘ The Department (Insurance) favors the highest quality optometric care, but this legislation will not accomplish such result. The bill is penal in nature and violation of its vague provisions is a misdemeanor. Because of its defects and ineffectiveness, we urge that it be vetoed.? ’ The Governor ended his veto by stating that the Department of Commerce, the New York State AFL-CIO, The Association of the Bar of the City of New York, and the National Association of Optometrists and Opticians, among numerous others, recommended disapproval.
In another field of endeavor the NYSOA founded the New York State Vision Services, Inc., for the avowed purpose of selling optometric services. The corporation employs optometrists to provide optometric services under contracts obtained by lay solicitors. This court marks the establishment of such organization by the NYSOA for the purpose of focusing on the ideological differences between the NYSOA and corporate employers of optometrists. On the one hand, the employment by the affiliate corporation of optometrists to render eye care is considered professional by the NYSOA, thereby permitting membership in the NYSOA; on the other hand, the employee optometrists of Sterling are beyond the Pale and therefore ineligible for membership in this professional society. This difference in viewpoint of the professional responsibilities of optometrists creates the problems involved in this matter.
Before proceeding to an analysis of the evidence concerning the procedure followed in the promulgation of the regulations under attack, the acts of the Education Department which precipitated the present action will be considered. On or about September 16, 1963, this department served notices on each optometrist and ophthalmic dispenser employed by the plaintiffs.
The notices to the optometrists quoted the provisions of regulation 70 (subd. 1, pars, d, e, f, g, h, j, h and l) and then warned:
*863 e ( Advertisements of your employer contain references which are in conflict with the subdivisions of Section 70 set forth above.
‘‘ Therefore in accordance with the regulations of the Commissioner of Education, you are advised that if you continue in the employ of your employer you will be subject to disciplinary action which could result in the revocation of your license.
‘ ‘ You are requested to notify this office on or before October 1, 1963, of the termination of your present employment.”
The notices to the ophthalmic dispensers quoted the provisions of regulation 76 (subd. 1, pars, b, c, d and e) and then contained the same wording as found in the above-quoted notice to the optometrists, except that this notice referred to section 76 instead of section 70.
The plaintiffs complain that these warning notices failed to allege any specific improper conduct on the part of the employer resulting in the optometrists and ophthalmic dispensers involved finding themselves on the horns of a dilemma. On one hand, if they did not terminate their employments, they faced the loss of their licenses and means of earning a living; on the other hand, if they quit their positions in accordance with the warning, they would forfeit accrued vacations, health and welfare benefits, seniority benefits, and pension rights.
The plaintiffs allege that after their employees had received these in terrorem warnings, repeated efforts were made by Sterling to obtain from the Education Department a bill of particulars of the alleged violations. When these attempts failed, Sterling commenced this action to protect the rights of its employee optometrists and ophthalmic dispensers.
In order to determine the legality of the regulations at issue it is necessary to outline the procedure followed in their promulgation.
In respect to the adoption of regulation 70 (subd. 1, par. i) “ Window Display ” the proposal was drafted by the NYSOA, thereafter submitted to the Education Department on November 1, 1960, and adopted in the form presented at a regular meeting of the Board of Regents in January, 1961.
The testimony discloses that the NYSOA submitted 2,000 cards to licensed optometrists to survey whether or not they favored a prohibition against display of a ‘! commercial nature. ’ ’ Thereafter, upon receiving an affirmative answer to 1,184 cards (including 64 duplications) from licensed optometrists to this proposition, the NYSOA requested the Education Department to promulgate the “ Window Display Rule ” in its present form. The NYSOA urged adoption, stating in substance that a “ consensus ” of opinion of the profession favored adoption, since the *864 card survey indicated that 75% of the “ optometrists actually practicing the profession and earning their livelihood from it in the State of New York favored the regulation.”
Basing his decision upon this recommendation, Associate Commissioner Killough on December 15, 1960, approved the proposed regulation in these words:
“ The card was signed and returned by more than 1200 of the approximately 2000 registered optometrists. The matter has been submitted to Mr. Brind who states that in view of the fact that the profession itself by a consensus of opinion recognized the advertising in question, he sees no legal objection to the proposed amendment. ’ ’
Further, an examination of the adoption of regulation 70 (subd. 1, par. k.) “ Advertising ” reveals that this rule was likewise drafted by the NYSOA, submitted by this professional society to the Education Department on December 19, 1962, and adopted without modification by the Board of Regents at a regular meeting held on February 28 and March 1, 1963.
The cards submitted to the members of the NYSOA sought an expression of opinion by them as to the prohibition of 1 ‘ advertising by optometrists to induce patronage.” In response to this request 1,279 cards in the affirmative were received, including 149 cards signed by optometrists who either lived or practiced outside New York State.
After the proposal of the NYSOA urging adoption of the ‘ ‘ Advertising ’ ’ Regulation had been received by the Education Department, Dr. Brind wrote a letter to Assistant Commissioner Killough approving the regulation. Thereafter Commissioner Killough on February 1, 1963, rendered his opinion as follows:
‘ ‘ The new paragraph relating to advertising as unprofessional conduct amplifies and clarifies existing paragraphs and permits appropriate announcements for optometrists opening new offices. * * * The NYSOA has polled the registrants in optometry of the State and reported to the Department that more than 75% of the practicing optometrists in this State signed cards requesting that advertising be eradicated from the practice of optometry. ’ ’
At this point the court refers to the testimony of Dr. Brind on the trial in respect to the credence given representations made by the NYSOA. His testimony stated: “ As far as the Department of Education is concerned, we have only the device of dealing with the society that represents the organization and when that society certifies to us whatever it certifies to us, we accept it at face value and it makes no difference to us how many members belong to the society. ’ ’
*865 Also at issue is the legality of regulation 76 (subd. 1, par. c.) “ Price Advertising ” applicable to ophthalmic dispensers. The proposal for the promulgation of this regulation was inaugurated by the Education Department, not by any professional society of ophthalmic dispensers. As a first step the department mailed cards to 2,289 registered ophthalmic dispensers requesting the members to vote “ Yes ” or “ No ” whether they favored the restriction on “ Price Advertising.” From the 2,289 registered ophthalmic dispensers solicited, the board received 848 answers: 683 in favor, 71 no opinion. Following this poll, which did not show a majority in favor, the department requested the Board of Directors of the Society of Dispensing Opticians to act in respect to the proposed regulation. The Board of Directors complied with the request and passed a resolution favoring the regulation. On the basis of this resolution, although only 683 of 2,289 registered ophthalmic dispensers (30%) voted for approval on the cards submitted by the department, Assistant Commissioner Killough, by a memorandum dated August 26, 1959, recommended adoption to the Board of Regents. Adoption followed.
During the course of the trial Dr. Brind made verbal recommendations to the Board of Regents for clarification, not amendment of the existing regulations in accordance with prior construction. The new regulation 70 (subd. 1, par. k.) “ Advertising ” adopted on May 26, 1967, now permits a privately practicing optometrist to place signs in his window not exceeding five, stating his name, his specialty, if any, or1 ‘ Eyes Examined ’ ’ or “ Prescriptions Filled ” or £< Contact Lenses,” with no such privilege granted to Sterling or similar corporations.
In addition, the Board of Regents amended regulation 70 (subd. 1, par. 1.) by requiring that the notice served upon the employee shall state the specific violation or violations alleged on the part of the employer and shall fix a date for a preliminary hearing pursuant to section 7108 of the Education Law at which time the employer and employee shall be heard and have the right to representation by counsel.
This court will now proceed to the rules of law applicable to the questions presented in this action as set forth previously.
The power of the Board of Regents to promulgate regulations in respect to optometry cannot be questioned. Mr. Justice Bebgan, now Judge Berg ax of the Court of Appeals, in Strauss v. University of State of New York (2 A D 2d 179,180 [3d Dept., 1956], mod. 2 N Y 2d 464 [1957]) wrote as follows:11 The powers of the Regents in respect of the practice of optometry as a profession are set forth in a statutory frame. There is, first *866 of all, a general duty to supervise the practice (Education Law, § 211). Besides this, there is a grant of power to the Education Department to revoke the license of an optometrist for ‘ unprofessional conduct ’ (§ 7108, subd. 1). There is a direct statutory prohibition against advertising ‘ The practice of optometry in violation of rules to be made by the department ’ (§ 7111, subd. 1).”
Subdivision 1 of section 7108 of the Education Law, referred to in Strauss (supra), provides for the suspension or revocation of an optometrist’s license on the grounds of “ unprofessional conduct, or of any fraud, deceit or misrepresentation in his practice or in his advertising ’ ’. However, a reading of the decisions in this State leads to the conclusion that the Legislature has not banned all advertising by optometrists but only those types constituting unprofessional conduct or of fraud, deceit or misrepresentation. “ This statute [Education Law, § 7108] necessarily qualifies and limits the general rule-making power conferred by section 211 (formerly § 51) and section 7111 (formerly § 1433) of the Education Law, and implies that not all advertising is unprofessional. That is, the Education Law impliedly permits some advertising by prohibiting only those types constituting ‘ unprofessional conduct ’ or of fraud, deceit or misrepresentation (Matter of Cherry v. Board of Regents, 289 N. Y. 148.) ” (Matter of Dubin v. Board of Regents, 1 N Y 2d 58, 62 [1956].)
Moreover, in determining the validity of the regulations, the court must consider only the situation which existed at the time the regulations were promulgated. The court agrees with the attorney for the NYSOA that it is not the function or power of the court to substitute its judgment for that of the Board of Regents or to arrive at such judgment on facts, true or false, which took place after the act of the administrative body (Strauss v. University of State of New York, 282 App. Div. 593, 597 [3d Dept., 1953]).
Furthermore, in determining the validity of the regulations, the court must look to the grounds invoked by the Board of Regents: “ It is a general rule of administrative law that ‘ a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis ’ ” (Matter of Blum v. D’Angelo, 15 A D 2d 909, 910 [1st Dept., 1962]).
*867 Although without question the power of the Board of Regents to regulate the professional conduct of optometrists exists, the power delegated by the Legislature to the Education Department is not unlimited. The power may not be exercised arbitrarily or capriciously; the regulations must be rationally related to the preservation of public health, safety and welfare (Matter of Cherry v. Board of Regents, 289 N. Y. 148 [1942]), and " applied to some actual and manifest evil ” (Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537, 541 [1956]).
Dr. Brind, attorney for the defendants, in answer to a question by the court, stated that the primary interest of the Board of Regents in making rules and regulations is the health and welfare of the people of the State and general public; the secondary interest would be that of the professional organization.
Where the regulation is based upon the consensus of professional practice — as in the instant case —, the ‘ consensus ’ ’ must be demonstrated by credible evidence of the prevailing practice of the profession at the time of its promulgation and must be determined by those standards which were commonly accepted by those practicing the same profession in the same territory (Matter of Cherry v. Board of Regents, 289 N. Y. 148,158, supra; Matter of Bell v. Board of Regents, 295 N. Y. 101, 110 [1945]). The Regents could not make regulations that would be startling to the profession and wholly alien to its traditions, feeling and practice ” (Strauss v. University of State of New York, 282 App. Div. 593, 596 supra [3d Dept., 1953]).
This court is impressed with the rules of law set forth by Halperw, J., in his dissenting opinion in Strauss v. University of State of New York (2 A D 2d 179, 186 [3d Dept., 1956], mod. 2 N Y 2d 464 [1957], supra) relative of the procedure to be followed by the Board of Regents in considering applications by professional societies to have regulations promulgated to forbid advertising on the ground they constituted unprofessional conduct. Halperu, J., held as follows: The Board of Regents may not by general rule forbid advertising unless it is of a kind which, under any and all circumstances, would necessarily constitute unprofessional conduct. Otherwise, it could by rule invade the area which the Legislature has placed beyond its reach (Matter of Cherry v. Board of Regents, supra [289 N. Y. 148]). The board can by general rule forbid types of advertising which are necessarily unprofessional, but it cannot by general rule deal with borderline cases and by rule declare to be unprofessional a particular type of advertising which may or may not be unprofessional, depending upon its exact nature and its factual setting. The Board of Regents could not by general regulation *868 ban proper use and improper use indiscriminately ’ (Matter of Cherry, supra, p. 160).” In the same opinion Ham-ebb, J., continued to outline the steps to be followed by a profession before the Board of Regents can promulgate regulations banning certain types of advertising, stating at page 190: “ In the existing statutory situation, the profession must first raise its standards by its own internal development and then it may ask the board to incorporate the higher standards in its rules. If the leaders of the profession wish to have the State play a more dynamic role in the area, they must appeal to the Legislature either to enact specific regulations of advertising, such as have been enacted with respect to dentistry and other professions, or to vest in the board the power to adopt and enforce rules regulating advertising, subject to appropriate standards to be set by the Legislature (Packer Collegiate Inst. v. University of State of N. Y., 298 N. Y. 184), but free from presently existing limitation that the rules may only reflect the prevailing professional standards. ’ ’
Further, in considering the facts in this conflict and taking into consideration the expressed aim of the NYSOA to take all steps possible to repeal section 7109 of the Education Law— thereby prohibiting plaintiffs from employing optometrists in the operation of their business of dispensing eyeglasses — this court must give consideration to the decision of the Court of Appeals in Loblaw, Inc. v. New York State Bd. of Pharmacy (11 N Y 2d 102, 107 [1962]) in which case that court, in holding that Bayer Aspirin tablets could be sold at plaintiff’s supermarket (not a pharmacy) quoted from Matter of Viemeister (179 N. Y. 235, 238): “ ‘ A statute entitled a health law must be a health law in fact as well as in name, and must not attempt in the name of the police power to effect a purpose having no adequate connection with the common good ’ and then continued: “ The public health will not be used as a pretext to aid one group in the community in the competitive race against another or to confer a monopoly in the sale of products ” (see, also, Trio Distr. Corp. v. City of Albany, 2 N Y 2d 690, 696; Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537, supra; Good Humor Corp. v. City of New York, 290 N. Y. 312). The regulation of any profession by the Board of Regents should be undertaken for the protection of the public, not the promotion of a profession. Regulations should not be promulgated to give strength to one segment of a profession and weaken another group in the same profession. ‘ The regulation of the practice of medicine [optometry] is undertaken by the State, not for the protection of the physicians [optometrists] themselves, but for the protection and welfare of *869 the people ” (People ex rel. Bennett v. Laman, 277 N. Y. 368, 374 [1938]).
Finally, in construing these regulations the court must take into consideration that Sterling’s business has a property right, constitutionally protected against deprivation by legislation or regulation having no adequate connection with the preservation of public health, safety and welfare: The court ‘ ‘ may not, in the guise of subjecting a profession to its responsibilities, arbitrarily interfere with private business ” (People v. Sterling Optical Co., supra, p. 420).
Guided by the applicable law enunciated by the appellate courts of this State, this court has searched in vain the voluminous record in this case for evidence to justify the promulgation of the “ Window Display ” Regulation (reg. 70, subd. 1, par. i.) in January, 1960 and the “Advertising” Regulation (reg. 70, subd. 1, par. Jc.) in March, 1963 by the Board of Regents. No rational relationship between these regulations and the preservation of the public health, safety and welfare of the people of this State has been found (Matter of Cherry v. Board of Regents, 289 N. Y. 148, supra; Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537, 541, supra). To the contrary, the evidence reveals that these regulations were drafted by the New York State Optometric Association in accordance with its avowed policy of eliminating the dispensing of eyeglasses by Sterling and other similar corporations; that these regulations did not represent the prevailing practice of a majority of optometrists at the time of their enactment (Matter of Cherry v. Board of Regents, 289 N. Y. 148, 158, supra; Matter of Bell v. Board of Regents, 295 N Y. 101, 110, supra); that these regulations ban indiscriminately each and every type of window display and advertising by optometrists in contravention of the decisions of the courts of this State (Matter of Cherry v. Board of Regents, 289 N. Y. 148, 160, supra; Strauss v. University of State of New York, 2 A D 2d 179,186, supra; Matter of Duhin v. Board of Regents, 1 N Y 2d 58, 62, supra); and, that the Board of Regents enacted these regulations solely upon the representations made by officers of the New York State Optometric Association minus any independent investigation to determine whether these rules would primarily benefit the general public, not the profession involved. In respect to this determination, the court finds significant the answer of Dr. Brind to a question propounded by plaintiffs’ attorney, that the public welfare did not require “ that optometrists be prevented from putting signs in the windows such as ‘ eyes examined ’ or prescriptions filled ’, ’ ’ which points out the need for clarification, since the attorney for the Intervenors *870 claimed throughout the trial that the display of a sign ‘ ‘ prescriptions filled ” by an optometrist constitutes “ unprofessional conduct.”
The amendment to the “Advertising” Regulation (reg. 70, subd. 1, par. k. 8 NYCRR 66.1 [a] [11]) promulgated by the Board of Regents on May 26, 1967, during the trial of this action on the verbal recommendation of Dr. Brind, permits a self-employed optometrist, to the exclusion of Sterling and other similar corporations, the right to display at his place of practice not more than five signs showing the name of the practitioner, his specialty, if any, or the words “ eyes examined,” “ prescriptions filled, ” or “ contact lenses ’ ’ and the privilege of sending recall notices to patients, and printing his name, address and telephone number on eyeglass cases or eyeglass cleaners, and the authority to list himself in directories under certain conditions, does not overcome the objections raised to the original regulation. As presently constituted this regulation gives a self-employed optometrist a competitive advantage over Sterling and its employee-optometrists. For example, a self-employed optometrist may open an office in a store adjoining a business site of Sterling. Pursuant to the provisions of the amended ‘ ‘ Advertising ’ ’ Regulation he has the right to place separate signs in his store window containing the words “ eyes examined,” “ prescriptions filled,” “ contact lenses,” his name, and his specialty. On the other hand, Sterling and its employee-optometrists are denied this privilege. Regulations or ordinances of this type, which aid one group in the community against another, or which give strength to one segment of a profession and weaken another without benefitting the general public, have been condemned by the courts of this State (Loblaw Inc. v. New York State Bd. of Pharmacy, 11 N Y 2d 102, 107, supra; Trio Distr. Corp. v. City of Albany, 2 N Y 2d 690, 696, supra; Matter of Viemeister 179 N. Y. 235, 238; People ex rel. Bennett v. Laman, 277 N. Y. 368, 374, supra).
In the consideration of the validity of these regulations a court must not ignore that the Legislature, when it enacted section 7109 of the Education Law in 1928, granted corporations such as Sterling the right to employ optometrists for the sole purpose of examining customers’ eyes to prescribe eyeglasses and to employ ophthalmic dispensers to dispense the lenses and frames (People v. Sterling Optical Co., supra, p. 421). By implication the Legislature in granting this authority permitted corporations to continue their business without interference so long as the interests of the general public were protected. These regulations —■“ Window Display ” and “ Advertising ” — not only interfere *871 with the operation of a private business in the guise of subjecting a profession to its responsibilities (People v. Sterling Optical Co., supra, p. 420; Liggett Co. v. Baldridge, 278 U. S. 105, 112-113), but also prevent Sterling and other similar corporations from truthfully informing the general public of their limited authority to examine customers’ eyes. From the evidence in this case the court is convinced that Sterling and other similar corporations should be compelled to disclose to the public by displays, advertising, or .listing in directories that the Legislature has not empowered them to examine the eyes of its customers for the purpose of diagnosing pathology. Instead of promoting the public health, safety and welfare of the people of this State, these Regulations prevent full disclosure to the public by accepted means of communication.
Although Sterling must observe rules promulgated for the conduct of its employee-optometrists (Finlay Straus, Inc. v. University of State of New York, 270 App. Div. 1060, 1061 [1946, 3d Dept.]), by the same token the Board of Regents should take into consideration the nature of Sterling’s business, its limited authority in examining eyes of its customers, and the demonstrated service it is rendering to the general public in dispensing eyeglasses at a reasonable cost. As a matter of course, the Legislature in its wisdom may at any time repeal the statute (Education Law, § 7109) permitting Sterling and other similar corporations to hire optometrists. However, this statute should not be emasculated step by step with the promulgation of regulations by the Board of Regents based upon proposals submitted by the New York State Optometric Association.
After taking into consideration the factual situation which existed at the time of the enactment of the “ Window Display ” and “ Advertising ” Regulations, the court finds that the plaintiffs have successfully demonstrated that no reasonable basis existed for an absolute ban against advertising or window displays on the part of corporations employing optometrists and ophthalmic dispensers in the sale of eyeglasses (Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537, 541-542, supra). In addition, since these regulations have not been shown to have an adequate connection with the preservation of public health, safety and welfare, this court finds that their enforcement will deprive Sterling of a property right in operating its business of dispensing eyeglasses (Loblaw, Inc. v. New York State Bd. of Pharmacy, 11N Y 2d 102, supra).
The decision of Mr. Justice Bruhu in Corn v. University of the State of New York (Sup. Ct., Albany County, Sept. 16,1963) is not followed for the reason that in Corn ‘ ‘ no proof was offered *872 by the petitioner to demonstrate that the ‘ consensus ’ of opinion of the profession with regard to the regulation adopted, (Window Display Regulation) was contrary to that felt by the Board, ’ ’ while in the instant case Sterling demonstrated by a preponderance of the credible evidence that the ‘ ‘ consensus ’ ’ presented by the NYSOA did not represent the practice of the profession at the time of the promulgation. Dr. Ashley King, Administrative Director of the NYSOA, testified that in his opinion 60-70% of the privately practicing optometrists in New York City displayed optical merchandise in their windows in the year 1961, the time of the enactment of the rule. Likewise, Sterling presented convincing proof through photographs and directories that the majority of self-employed optometrists advertised in one way or another in the year 1963, the time of the enactment of the Advertising ’ ’ Regulation.
Before considering the legality of regulations 70 (subd. 1, par. 1) (8 NYCRR 66.1 [a] [12]) and 76 (subd. 1, par. e.) (8 NYCRR 67.1 [a] [5]) — relating to notice given by the Education Department to optometrists and ophthalmic dispensers — , the contention of Sterling that regulation 76 (subd. 1, par. c.) “Price Advertising ” (8 NYCRR 67.1 [a] [3]) and regulation 76 (subd. 1, par. d.) “ Advertising Gratuitous Services ” (8 NYCRR 67.1 [a] [4]) applicable to ophthalmic dispensers are unconstitutional, illegal and unenforcible should be disposed of. Since no convincing proof during the trial of this action has been offered that Sterling, at the time of the promulgation of these Regulations, engaged in “ Price Advertising ” or “ Advertising Gratuitous Services,” the court declines to pass upon their legality. Under these circumstances any finding this court might make would not bind persons not a party to this action.
The claim of plaintiffs that regulation 70 (subd. 1, par. 1.), which applies to optometrists, and regulation 76 (subd. 1, par. e.), which applies to ophthalmic dispensers, are unconstitutional, illegal and unenforcible must also be reviewed. Regulation 70 (subd. 1, par. 1.), prior to the amendment thereto of May 26, 1967, read as follows:
1. Aiding or abetting, either directly or indirectly in the conduct of advertising of any employer, firm or associate if such conduct or advertising conflicts with the foregoing regulations; or continuing the practice of optometry with any such employer, firm, or associate after the optometrist has received written notice from the Board of Examiners or from the Department of such conduct or advertising by the employer, firm, or associate. Regulation 76 (subd. 1, par. e.) read as follows:
*873 e. Aiding or abetting, either directly or indirectly, in the conduct of advertising of any employer, firm or associate if such conduct or advertising conflicts with the foregoing regulations; or continuing the practice of ophthalmic dispensing with any such employer, firm or associate after the ophthalmic dispenser has received written notice from the Board or the Department of such conduct or advertising by the firm or associate.
On or about September 16, 1963 the Education Department served a notice on each optometrist and ophthalmic dispenser employed by Sterling which stated:
‘ ‘ Advertisements of your employer contain references which are in conflict with the subdivisions of Section 70 [Section 76 in notice to ophthalmic dispensers] set forth above.
“ Therefore in accordance with the regulations of the Commissioner of Education, you are advised that if you continue in the employ of your employer you will be subject to disciplinary action which could result in the revocation of your license.
‘ ‘ You are requested to notify this office on or before October 1, 1963, of the termination of your present employment.” Contained in the notices sent to optometrists were the provisions of regulation 70 (subd. 1, pars. d. “ Fraudulent Advertising,”; e. “ Advertising Professional Superiority,”; /. “ Price Advertising,”; g. “ Large Display Advertising,”; h. “ Advertising Gratuitous Services, ”; j. “ Practicing Optometry under any name other than which he has been licensed, ”; Tc. “ Advertising ”, and l. regulation quoted above). It should be noted that the “ Window Display ” regulation (reg. 70, subd. 1, par. i) was not included.
Contained in the notices sent to ophthalmic dispensers were the provisions of regulation 76 (subd. 1, pars. b. “ Fraudulent Advertising, ”; c. “ Price Advertising, ”;d.“ Advertising Gratuitous Services ”, and e. regulation quoted above).
This type of notice violates a fundamental principle in our law that a person accused of wrongdoing should be informed of his wrongful act in clear and unmistakable language. He should not be obliged to conjecture as to the charge made against him; he should be able to decide from the charge if he were guilty of some prohibited act. The Education Department in this instance notified the employee-optometrists that their employer had advertised in conflict with the provisions of eight paragraphs of subdivision 1 of regulation 70. In fact, the only possible violation on the part of Sterling was disregarding the provisions of regulation 70 (subd. 1, par. 7c.) (“ Advertising ”).
Likewise, the notice to the employee ophthalmic dispensers of Sterling charged Sterling with advertising in conflict with four
*874 paragraphs of ¡subdivision 1 of regulation 76, whereas in fact no such violation had occurred.
“ Shotgun ” charges should not be leveled against a professional man by any person in authority. A professional man should not have to determine under these conditions whether on one hand, he must leave his employment or, on the other, remain at his job with the possibility of suspension of his license to carry on his chosen work.
For these reasons this court finds that part of regulation 70 (subd. 1, par. 1.) in effect on September 16, 1963, which reads ‘ ‘ or continuing the practice of optometry * * * associate ’ ’
is illegal and unenforcible. Likewise, that part of regulation 70 (subd. 1, par. 1.) in effect on September 16, 1963, which reads “ or continuing the practice of ophthalmic dispensing * * *
associate ” is illegal and unenforcible. The notices served pursuant to said regulations are declared null and void.
The Board of Regents on May 26, 1967, after the commencement of this action, amended regulation 70 (subd. 1, par l.) by adding the following: ‘‘ The notice shall state the specific violation or violations alleged on the part of such employer, firm or associate and shall fix a date for a preliminary hearing pursuant to Section 7108 of the Education Law, at which time the optometrist and his employer shall be heard and shall have the right to representation by counsel.”
Since this amendment provides for a statement of the specific violation or violations alleged on the part of the employer and fixes a date for a preliminary hearing with the right to be represented by counsel, the illegality of the original regulation has been corrected and therefore is now valid.
This court would be remiss if it did not express its appreciation to counsel in this case for the excellent and informative memorandums submitted both before aud after the trial. They have aided immensely in reaching a decision in this action.
After reading the record of these proceedings, the court is more convinced than ever that either the Legislature or the Education Department should bring together at a hearing all persons, societies, organizations, and agencies interested in the future eye care of citizens of this State. The existing animosity between ophthalmologists and optometrists on one hand and the members of the New York State Optometric Association and the employers of optometrists on the other, expressed by witnesses and attorneys during the trial, if permitted to continue, will adversely affect the health of the public for the foreseeable future. Only a public exposure of the problems involved will result in the enactment of legislation and the promulgation of *875 regulations adapted to this era when health care is the primary concern of all. Shocking disdain for public needs stands revealed, as no provision has been made for a School of Optometry at a time when the State of New York is planning and erecting a State University, which in time will become a model in educational advantages for our youth. Our young men must travel to Ohio, Pennsylvania, Massachusetts, or California in order to acquire a degree permitting them to practice the profession of Optometry in this State. The testimony in the record in this matter cries out for immediate action. Hopefully these words will not be lost in the wilderness of self-interest.

 §§ 7101-7111.