In the Matter of WILLIAM BELL, Respondent, against THE BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, Appellant.

Argued October 1, 1945; decided January 17, 1945.

*Nathaniel L. Goldstein, Attorney-General (Henry S. Manley* and *Orrin G. Judd* of counsel), for appellant. " Ambulance chasing "`is unprofessional conduct in the dental profession, and was known to be such in the years 1939 to 1942. *(Matter of Cherry* v. *Board of Regents,* 289 N. Y. 148.)

*Lloyd Paul Stryker, Harold Shapero* and *Saul Sperling* for respondent. I. In view of the " omnibus character and indefinite generality " of clause (h) of subdivision 2 of section 1311 of the Education Law, the Board of Regents is without power to impose a penalty for an act which it has not previously by a canon or rule classed as " unprofessional conduct ". *(Matter of Cherry* v. *Board of Regents,* 289 N. Y. 148.) II. The claimed breach was of a private rather than of an official regulation. The appellant cannot delegate to a private society the duty entrusted to it by the Legislature to ascertain and then by rule to prescribe a standard of conduct. *(Matter of Cherry* v. *Board of Regents,* 289 N. Y. 148.) III. The assumption by appellant that the standard of the private society reflects the " consensus of expert opinion " or the " general understanding of the profession " is not justified by the record.

CONWAY, J.  The respondent graduated from a college of dentistry in this State in 1919, and in that year was licensed to practice dentistry.  At the time of the institution of this proceeding, he maintained an office for the practice of dentistry in New York City.  The determination of the appellant Board of Regents sustained the finding of the State Board of Dental Examiners that the respondent was guilty of " unprofessional conduct " within the meaning of subdivision 2, clause (h), of section 1311 of the Education Law of the State of New York, and suspended the license of respondent for a period of one year.  At the hearing before the Board of Dental Examiners, there was no question of fact as to which there was any issue. As respondent recites in his petition for certiorari, he did not file an answer but demurred to the charges and moved to dismiss them upon the ground that they failed to state facts sufficient to constitute unprofessional conduct as set forth in Education Law, section 1311, subdivision 2, clause (h), and upon the ground that the evidence offered in support of them did not establish a violation of that section and subdivision. The respondent offered no testimony and did not testify. Among the findings of the State Board of Dental Examiners were the following: " Fourth: The uncontradicted testimony, adduced before the sub-committee, establishes, and we find, that respondent did some time in the month of April, 1939, employ one Carl Anderson for the primary purpose of contacting prospective patients and arranging to bring these patients to the respondent for dental treatment.  This employment continued until the latter part of October, 1942.  Under the arrangement made by respondent with the said Anderson, Anderson was to receive and did receive commissions on fees collected by the respondent from patients brought to him by Anderson.  The commissions varied in amount from 20% to 50% of the fees collected from these patients for some period of time extending over one year, when a flat commission of 35% was thereupon paid by the respondent to said Anderson. Anderson was paid by respondent during the period of time aforementioned sums totaling about $20,000, and in addition thereto Anderson received an additional compensation of $10 per week to cover expenses incurred by Anderson in supplying and maintaining an automobile which was used in transporting patients to and from respondent's office.

"Fifth: It was stipulated that the said Carl Anderson was not during the period of his employment by respondent, or at any other time, duly registered to practice dentistry in the State of New York."

The State Board of Dental Examiners concluded that because of respondent's acts "he was guilty of unprofessional conduct within the meaning of Subdivision 2(h) of Section 1311 of the Education Law of the State of New York." The applicable portion of section 1311 of the Education Law, which is entitled Revocation of Licenses, read, during the period covered by Findings Fourth and Fifth above, as follows (L. 1935, ch. 406): " 2. The license and registration of a practitioner of dentistry may be revoked, suspended or annulled, * * * upon decision and due hearing in any of the following cases: (a) that the dentist has been guilty of immoral conduct; (b) * * *; (c) * * *; (d) * * *; (e) * * *; (f) * * *; (g) * * *; (h) that the dentist has been otherwise or in any other way guilty of unprofessional conduct."

Prior to that amendment in 1935, section 1311, subdivision 2, clause (a) read " that the dentist has been guilty of unprofessional or immoral conduct; " (L. 1933, ch. 609). Unprofessional and immoral conduct had been linked together prior to 1933 in section 1311 in Laws of 1927, chapter 85, subdivision 2, the first sentence of that subdivision beginning: " If any practitioner of dentistry be charged under oath before the board with unprofessional or immoral conduct, or with gross ignorance, or inefficiency in his profession, * * *." The Board of Regents has never adopted any " regulation " defining either immoral or unprofessional conduct. Nevertheless, it is urged upon us that unless the Board of Regents prescribes by regulation the acts which shall constitute unprofessional conduct, no dentist may be disciplined under section 1311, subdivision 2, clause (h). That never has been the law of this State (*Matter of Mandel* v. *Board of Regents,* 1928, LEHMAN, J., 250 N. Y. 173; *Matter of Cherry* v. *Board of Regents,* 1942, LEHMAN, Ch. J., 289 N. Y. 148) and, apart from the authorities cited, the Legislature has indicated that quite clearly this year by two amendments to Education Law. One amended Education Law, section 1368, in the article dealing with pharmacy, so as to provide for the revocation or suspension of a license

or certificate of one admitted to practice pharmacology " who has been guilty of unprofessional conduct as defined by the regents * * .*." (L. 1945, ch. 755, eff. July 1, 1945.) The second amended Education Law, section 1311, subdivision 2, clause (h) (the one we are discussing here) by adding the following sentence: " The board of regents *may* promulgate rules to define and clarify, *when necessary,* unprofessional conduct." (L. 1945, ch. 805, eff. April 16, 1945.) (Emphasis supplied.) In other words, when the Legislature desired to have the Board of Regents make rules defining the acts constituting unprofessional conduct, as in section 1368, it so provided. When the Legislature desired merely to empower the Board of Regents to promulgate rules defining and clarifying unprofessional conduct, when the board considered it necessary, it provided that.

The reason for respondent's argument is no doubt a failure to distinguish between the *Mandel* case on the one hand and the cases of *Matter of Dr. Bloom Dentist, Inc.,* v. *Cruise* (259 N. Y. 358), *Brown* v. *University of the State of New York* (266 N. Y. 598) and the *Cherry* case on the other. We tried to make the distinction clear in the *Cherry* case. In the instant case, we have a straight charge of unprofessional conduct, without any " regulation " or " rule " adopted by the Board of Regents affecting Education Law, section 1311, subdivision 2, clause (h), under which the charge was brought. In the *Bloom* case, the *Brown* case and the *Cherry* case, we were dealing with charges brought by reason of a *regulation* adopted by the Board of Regents, pursuant to legislative permission, which, in the *Brown* and *Cherry* cases, affected the subdivision of section 1311 relating to advertising. In the *Bloom* case a similar *regulation* forbade:

" 1. Any advertising statements of a character tending to deceive or mislead the public. * * * 4. Advertising by means of large display, glaring, illuminated or flickering light signs." (p. 363).

In the *Brown* case, the plaintiffs were duly licensed and registered dentists who brought action permanently to enjoin the Board of Regents from enforcing its *rule* numbered " 8 ", which declared that " the following forms of advertising are considered unprofessional and objectionable. * * * 8. The employment of letters, handbills, posters, circulars, cards,

stereopticon slides, motion pictures, radio, newspapers or other advertising devices for the purpose of soliciting patronage, except that a dentist may use personal professional cards of a modest type announcing his name, title, address, telephone number and office hours.''

The *rule* was to go into effect upon August 1, 1933, but was postponed until October 1st. Section 1311, subdivision 2, clause (g) was added by chapter 609 of the Laws of 1933, effective September 1, 1933. Prior to that time, there had been no lettered divisions of section 1311, subdivision 2, and no provision in subdivision 2 relating to dental advertising. By the addition of (g) to subdivision 2 in 1933, revocation, suspension or annulment of the license of a practitioner of dentistry might be had if it appeared '' (g) that the dentist is [were] guilty of untrue, fraudulent, misleading or deceptive advertising.'' We held that the *rule* or *regulation* outran the statute. We pointed that out in the *Cherry* case (p. 157) where, in speaking of the *Brown* case, we said: '' We held that the regulation of the Board of Regents was invalid only because the Legislature, having itself fixed a standard for dental advertising and having provided that failure to abide by *such* standard was ground for revocation of a license, had by necessary implication sanctioned advertising which did not transgress the express ban of the statute, and had not delegated to the Board of Regents power to provide other standards of permissible advertising or to create additional grounds for revocation of license.''

In the *Cherry* case, again we had presented a question involving a *regulation* adopted by the Board of Regents with reference to advertising. It was a charge under section 1311, subdivision 2, clause (g), although there was imported - into it the words '' unprofessional conduct '' from subdivision 2, clause (h). The charge was that Cherry between certain dates '' did make use of and employ a certain dental credit agency as *advertising solicitors and free publicity press agents* for the purpose of obtaining patients for his dental practice, * * * '' (p. 151) and did obtain certain named patients through this means. The difficulty was that the Legislature had not written into the statute in subdivision 2, clause (g), any provision with reference to advertising solicitors or publicity press

agents. Again, we said that the *regulation* was broader than the statute and so exceeded the legislatively delegated power of the regents. Our reasoning was clear to the Legislature for it added the words: " or by advertising through the mediums of *advertising solicitors or publicity press agents* " by Laws of 1945, chapter 805. We carefully pointed out in the *Cherry* case (p. 160) that the " only charge against the petitioner is a violation of the ban against employment and use of advertising solicitors and free publicity agents, and that is the only act or conduct of which the petitioner has been found guilty; yet, as we have said, violation of that regulation is not by itself a ground for revocation of a license to practice dentistry." We also indicated (p. 160), and this makes the distinction clear, that co-operation by Cherry in the plan of the so-called " dental credit service " might be regarded as ". unprofessional conduct " even without a *regulation*, but that that was not the charge which had been tried by the Dental Board. That is, however, the charge now presented to us. It is a charge of unprofessional conduct in that the respondent took a layman into the conduct of his professional work on a percentage basis.

It has never been necessary for the Legislature or the Board of Regents to define with particularity acts which would constitute unprofessional conduct, whether in the fields of dentistry or pharmacy. In the *Mandel* case (*supra*), in which the opinion was written by the same distinguished judge who wrote in the *Cherry* case, the then applicable Public Health Law, section 240, later Education Law, section 1362, provided that " Any license or certificate obtained by misrepresentation or fraud or that is held by anyone unfit or incompetent from negligence, habits or other cause may be revoked after reasonable notice and an opportunity to be heard." We upheld the action of the State board, saying (p. 175):

" The Legislature has vested in an administrative board power to determine the fitness and competency of those who desire to practice pharmacy in this State, both before and after a license has been granted. The Board has revoked the license of the petitioner as ' junior pharmacist,' not because that license was obtained by fraud, but because it has found that the petitioner was ' guilty of fraud in endeavoring to procure a pharmacist license, and consequently was and is unfit to practice the profession of pharmacy under any form of license.'

" The Legislature has not attempted to define the causes which may produce unfitness or incompetency sufficient to justify revocation of a license, nor the acts which shall be regarded as sufficient evidence of such unfitness or incompetency. The statute is enacted for the protection of the public against the dangers that might arise from the practice of pharmacy by the unfit and incompetent. It is the lack of fitness or competency in a practitioner which creates the danger, regardless of how such lack may have arisen or how it has been demonstrated. Negligence or bad habits may usually be at its root; ' other cause ' may give rise to it. The Legislature has in terms declared that the Board shall look to the result, not the cause, as ground for revocation of a license. Narrower construction of the statute would unreasonably limit its language and in part defeat its purpose.

" It is said that under that construction the Legislature has attempted to delegate to an administrative board the unrestricted power to define offenses to which the penalty of the revocation of a license shall attach, and that such power is a legislative function which may not be delegated. (*Czarra* v. *Board of Medical Supervisors,* 25 App. Cas. [D. C.], 443; *Hewitt* v. *Board of Medical Examiners,* 148 Cal. 590.) Unquestionably the definition of offenses and the prescription of punishment for such offenses is a legislative power. (*U. S.* v. *Eaton,* 144 U. S. 677.) The power vested in the administrative board and exercised by it in this case has a different scope.

" Denial or revocation of a license because of guilt of an offense which tends to show moral or intellectual unfitness does not constitute punishment for the offense. (*Hawker* v. *New York,* 170 U. S. 189.) It is only a measure of protection of the public.

\*  \*  \*  \*  \*  \*  \*

" Unquestionably the practice of pharmacy is subject to regulation by the State; unquestionably for centuries legislative bodies have been accustomed to empower administrative boards or officers to select the persons who shall be permitted to practice a vocation which is subject to regulation by the State. The selection may not be arbitrary. Grant or revocation of a license must rest upon reasonable grounds, but exercise of discretion in connection with an act performed customarily by administra-

tive officers does not change an administrative act into a legislative act. A statute which empowers an administrative officer in the exercise of a reasonable discretion to withhold a license from such persons as he may find unsuitable and in the exercise of a similar discretion to revoke a license already granted to a person who may be unfit, does not constitute delegation of a legislative power. (*People ex rel. Lieberman* v. *Van De Carr, supra.*)"

To the same effect, in *Matter of Cherry,* we said (p. 158): " What constitutes unprofessional conduct by a dentist must be determined by those standards which are commonly accepted by those practicing the same profession in the same territory. The law is a very ancient profession and certain forms of conduct have been banned as unprofessional for centuries in both England and America. Ancient traditions have created rigid bans and by common consent those who violate those bans should be excluded from the goodly company of the members of the bar. At least in part these bans have been formulated in Canons of Ethics adopted and enforced by associations of members of the bar. In the profession of the law no person can plead ignorance as palliation for professional misconduct. In vocations, like dentistry, more recently accepted as professions, professional standards are perhaps less uniform, less well understood, and less rigidly defined. Nonetheless, the standards of conduct generally accepted by practitioners in the State of New York are not so indefinite that they cannot be determined by qualified persons. They are part of the ethics of the profession and ' what is generally called the " ethics " of the profession is but the consensus of expert opinion as to the necessity of such standards.' (*Semler* v. *Oregon State Board of Dental Examiners, supra,* p. 612.) Every member of the profession should be regarded as an expert for such purpose. There is a moral dereliction in failure by any member of a profession to apply in professional practice the standards which, by consensus of opinion in the profession, are necessary."

Unless the respondent's acts proved here constitute unprofessional conduct within the meaning of section 1311, subdivision 2, clause (h), we must construe the language of the opinion in the *Cherry* case as inapplicable to any given or imagined course of conduct by a dentist, and that we are not

prepared to do. We must assume, in view of Education Law, article 3, sections 46, 51, and article 49, entitled Dental Societies and the Practice of Dentistry, and respondent's pursuit of educational qualifications and licensing requirements thereunder that he knew he had entered upon a profession. It seems to us that there is one course of conduct which in each and every profession is known as a matter of common knowledge to be improper and unprofessional. That is conduct by which, after a professional man has been licensed by the State, he enters into a partnership in his professional work with a layman, by the terms of which he divides with the latter, on a percentage basis, payments made by client or patient for professional services rendered. That is what the respondent did here.

The order should be reversed, with costs, and the determination of the Board of Regents confirmed.

THACHER, J. (dissenting). The opinion of the court characterizes as unprofessional conduct, known to be improper and unprofessional as a matter of common knowledge in each and every profession, " conduct by which, after a professional man has been licensed by the State, he enters into a partnership in his professional work with a layman, by the terms of which he divides with the latter, on a percentage basis, payments made by client or patient for professional services rendered." Thus this court is writing for all the professions in this State a rule of ethics. With great deference, it must be said that the rule, if limited to the facts in this case, has not received the universal acceptance claimed for it. Surely it cannot be said that it is unprofessional to employ one who is not a member of the profession in nonprofessional work and pay him a percentage of the gains from professional service. Indeed an office manager in a large law office may well be paid a percentage of the firm's earnings for his nonprofessional but highly valuable services in management of the office and such an arrangement is neither immoral nor unethical. Many other analogies must exist in the management of hospitals and will frequently recur in the important growth and development of group medicine.

In this case the payment was made to one who was not a dentist for performing services of a strictly nonprofessional

character, namely, in bringing from the steamship piers to the respondent's office seamen requiring dental work. These men were ignorant of our language and unable to find their way from place to place within the city and the arrangement was certainly not *malum in se* and, for all that appears, may well have been decidedly in the public interest.

If one is to be deprived of his professional livelihood he is entitled to be warned in advance that conduct which is neither reprehensible nor prohibited by law may have such consequences. We cannot accept the view that the Legislature intended to authorize suspension or removal from the professions for every breach, whether or not reprehensible, of rules of ethics promulgated without legislative sanction. The Board of Regents was authorized, both before and after the amendment of subdivision 2, clause (h) of section 1311 of the Education Law, to promulgate rules to define and clarify, when necessary, unprofessional conduct (*Matter of Dr. Bloom Dentist, Inc.,* v. *Cruise,* 259 N. Y. 358, 363–364; *Matter of Cherry* v. *Board of Regents,* 289 N. Y. 148, 155; L. 1945, ch. 805). Such definition and clarification are essential to basic concepts of fair play if a man is to be tried and suspended or removed from his profession for a breach of professional ethics by conduct in no sense reprehensible or opposed to the public interest.

In *Matter of Cherry* v. *Board of Regents* (289 N. Y. 148, 154), the Appellate Division having sustained a determination of the Board of Regents which suspended Dr. Cherry from practicing his profession for a period of six months, we reversed and held that the employment of a dental credit agency as advertising solicitors and free publicity press agents for the purpose of obtaining patients, and obtaining persons as patients through such practices, was not a ground for suspension of license. The effect of the legislative prohibition of specified means of advertising on the validity of the rule prohibiting the additional means charged against Dr. Cherry was considered, but we held that, although the statute by necessary implication " sanctions the use of other means of publicity ", by no possible implication did it sanction " the use of the permitted means for a purpose or in a manner which would constitute unprofessional conduct." (p. 158). Consequently, it was necessary to consider whether suspension for unprofessional conduct was permissible in that case, and we concluded that it was not. The

following language from the opinion (at pp. 160–161) shows the basis upon which that decision was predicated:

"Advertising solicitors and free publicity press agents are ordinarily employed and used for a purpose and in manner which would be regarded as unprofessional and improper, even if not specifically banned by regulation. As we have said, the statute cannot be construed as an implied sanction of such employment or use. Nonetheless, there may be occasions when advertising solicitors or free publicity press agents may be employed or used for proper purposes and in proper manner; and the Board of Regents could not by general regulation ban proper use and improper use indiscriminately.

"*  *  * The only charge against the petitioner is a violation of the ban against employment and use of advertising solicitors and free publicity agents, and that is the only act or conduct of which petitioner has been found guilty; yet, as we have said, violation of that regulation is not by itself a ground for revocation of a license to practice dentistry. Cooperation by the petitioner in the plan of the so-called 'dental credit service' might well be subject to censure as 'vulgar commercialism' and we assume that it could be banned by regulation of the Board of Regents, and might be regarded as unprofessional conduct even without such a regulation. That is not, however, the charge which has been tried by the Dental Board. Indeed, we cannot overlook the fact that in its recommendation that Board stated, 'We are satisfied that respondent discontinued the practices complained of herein as soon as it was brought to his attention that these practices were considered objectionable and unprofessional.' In effect, that is a finding that the petitioner acted without wrongful intent and in the belief that his conduct was not 'objectionable and unprofessional.' Quite evidently the Dental Board found a wrong which, in its opinion, was only technical and at least partly venial.

"Since the conduct charged here as 'unprofessional' is not of itself a ground for suspension of license, the order of the Appellate Division should be reversed".

From the record now before us it appears that there was not only no rule or regulation of the Board of Regents warning the respondent that the arrangement for which he has been suspended for one year was improper, but, in the absence of any evidence of reprehensible conduct, wrongful intent or

prejudice to the public interest, the respondent has been deprived of his livelihood because " the payment of commissions by licensed dentists to laymen is regarded as unethical by practitioners, generally, of the dental profession in the State of New York and such practice has been defined as unethical * * * in Canons of Ethics adopted and promulgated by the American Dental Association of the United States " and other associations local to the City and State of New York. It is at least questionable whether upon the record before us the payments made by Dr. Bell were commissions within the rule of these associations; certainly not if the rule would not be violated by paying to an office manager a percentage of professional earnings in compensation for nonprofessional services. Under the decision in the *Cherry* case (*supra*), the conduct proved here would not of itself be a ground for suspension of license even if it had been banned by a rule of the board.

The generality of subdivision 2, clause (h) of section 1311 of the Education Law was by our decision in the *Cherry* case (*supra*), restricted to exclude from the term " unprofessional conduct " co-operation by the petitioner in the so-called dental credit service plan which we considered might well be subject to censure and regarded as unprofessional conduct even without regulation by the Board of Regents. Such restrictive interpretation is generally considered necessary to save the validity of such statutes. In *Sage-Allen Co., Inc.,* v. *Wheeler* (119 Conn. 667), the court so construed the words " immoral ", " fraudulent ", " dishonorable " and " unprofessional " contained in a similar statute regulating the profession of optometry. There the court held (at pp. 678, 679) : " These words in themselves have no significance in law even to a reasonable certainty and might seem to authorize the revocation of a license for acts having no reasonable relation to the underlying purpose of the statute, the protection of the public. Giving these words a broad meaning, it would be difficult to justify the grant to the board of power to revoke a license for any conduct which it might deem to be immoral, dishonorable or unprofessional. [Citing cases.] But if we did give to these words so broad a meaning, we would be attributing to the Legislature an intent to vest the board with power going beyond the scope of its purposes and to enact a law of at least doubtful constitutionality. We cannot assume that the Legislature intended to

give expression to such an intent and must, if it is reasonably possible to do so, so construe the words it has used as to make the provision a valid and reasonable one. [Citing cases.] The words must have been used in the light of the fundamental purpose of the statutes to regulate the profession in the public interest, and they can only be construed as intending to include conduct within their fair purport which either shows that the person guilty of it is intellectually or morally incompetent to practice the profession or has committed an act or acts of a nature likely to jeopardize the interest of the public."

We concur in these views, which are generally supported in other jurisdictions (*Aiton* v. *Board of Medical Examiners*, 13 Ariz. 354; *State ex rel. Lentine* v. *State Board of Health*, 334 Mo. 220, 233; *State Board* v. *Savelle*, 90 Col. 177, 187; *Walker* v. *Corwin*, 210 Minn. 337, 340; *Freeman* v. *State Board of Medical Examiners*, 54 Okla. 531, 538; *Forman* v. *State Board of Health*, 157 Ky. 123, 128).

But, even if the case were one which could stand upon a rule of the board, it would emphatically call for the application of the principle stated by Chief Judge LEHMAN in his opinion in the *Cherry* case (*supra*, at p. 154): " The Legislature, of course, could not grant to an administrative board or quasi-judicial tribunal power to impose such a penalty upon a dentist for act or conduct not defined in advance. That would be contrary to our basic concepts of justice. Nor could it delegate to the Board of Regents legislative power to define, in accordance with an unfettered discretion, the acts or conduct which, in the opinion of the Board, would justify disciplinary action against a dentist." Here there was no definition in advance. There was a naked determination of " unprofessional conduct " which in and of itself was not found to be and was in no sense reprehensible or immoral.

Under these circumstances we are constrained, with deference, to dissent from the opinion of the court in the belief that the unanimous order of the court below should be affirmed.

LEWIS, DYE and MEDALIE, JJ., concur with CONWAY, J.; DESMOND, J., concurs in result only, because he believes that the rule as to division of fees is stated too broadly in the second last paragraph of the majority opinion; THACHER, J., dissents in opinion in which LOUGHRAN, Ch. J., concurs.

**Order reversed,** etc. (See 295 N. Y. 821.)