## Pennsylvania State Board of Pharmacy *v.* Cohen, Appellant.

Argued May 2, 1972.  Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*J. Thomas Menaker*, with him *McNees, Wallace & Nurick*, for appellant.

*Gerald Gornish*, Deputy Attorney General, with him *J. Shane Creamer*, Attorney General, for Pennsylvania State Board of Pharmacy, appellee.

OPINION BY MR. JUSTICE ROBERTS, June 28, 1972:

Appellant Leonard Cohen seeks reversal of an adjudication and order by the State Board of Pharmacy[1] suspending his pharmacist's license for one year and revoking indefinitely his pharmacist's permit.[2] On November 25, 1970, the Board issued a citation and notice of hearing, charging that appellant had "openly sold vast quantities of drug containers and supplies to dilute drugs to drug traffickers. . . ." After hearing, the Board concluded that appellant had violated Sections 390-5(a)(9) and 390-5(b)(2) of the Pharmacy Act[3] and entered the above described order. On appeal to the Commonwealth Court, the Board's order was affirmed. *Cohen v. Board of Pharmacy*, 4 Pa. Commonwealth Ct. 398, 285 A. 2d 912 (1972). We granted allocatur and now reverse because appellant's conduct did not violate any of the thirteen prohibitions constituting "grossly unprofessional conduct" in Section 390-5(a) (9), any other provision of the Pharmacy Act, or any

---

[1] Hereinafter referred to as the Board.

[2] The suspensions of the license and permit were directed by the Board under the Pharmacy Act, Act of September 27, 1961, P. L. 1700, §§5(a)-(b), 63 P.S. §§390-5(a)-(b).

[3] Id.

rule or regulation promulgated thereunder,[4] or for that matter any other law of the Commonwealth.

At the hearing before the Board, evidence was introduced which was not disputed that appellant, during 1969 and 1970, purchased from a drug wholesale house and sold to various customers large quantities of gelatin capsules, lactose, and quinine hydrocholoride. These purchases and sales did not violate any provision of the Pharmacy Act, any rule or regulation promulgated thereunder or any other law of Pennsylvania. Appellant conceded that he made these purchases and sales and that out of state customers were not purchasing these items for "honest usage" but contended that the sales were made in cooperation with the Harrisburg Police Department in order to aid apprehension of "drug traffickers" from Maryland. A detective of the Harrisburg Police Department refuted appellant's contention and the Board chose to believe the detective's testimony.

The Board concluded as a matter of law that appellant was guilty of "grossly unprofessional conduct" in violation of Section 390-5(a)(9), which provides:

"(a) The board shall have the power to revoke or suspend the license of any pharmacist upon proof satisfactory to it that: . . .

"(9) He is guilty of grossly unprofessional conduct. The following acts on the part of a pharmacist are hereby declared to constitute grossly unprofessional conduct of a pharmacist:

"(i) Willfully deceiving or attempting to deceive the State Board of Pharmacy or its agents with respect to any material matter under investigation by the board;

"(ii) The advertising to the public of prices for prescriptions, dangerous or non-proprietary drugs, or any reference to the price of said drugs or prescriptions

---

[4] See note 10 infra.

either specifically or as a percentile of prevailing prices;[5]

"(iii) The public assertion or implication of professional superiority in the compounding of prescriptions;

"(iv) The engaging by any means in untrue, false, misleading or deceptive advertising of drugs or devices;

"(v) Paying rebates to physicians or any other persons, or the entering into any agreement with a medical practitioner or any other person for the payment or acceptance of compensation in any form for the recommending of the professional services of either party;

"(vi) The entering into of any agreement with a licensed medical practitioner for the compounding or dispensing of secret formula (coded) prescriptions;

"(vii) The misbranding or adulteration of any drug or device and the sale, distribution or dispensing of any misbranded or adulterated drug or device as defined in the Drug, Device and Cosmetic Act.

"(viii) Engaging in the sale of [sic] purchase of drugs or devices whose package bears the inscription 'sample' or 'not for resale'.

"(ix) Displaying or permitting the display of his license in a pharmacy of which he is not the proprietor or in which he is not employed;

"(x) Any holder of a license or certificate to fail to display same while actually engaged in the practice of pharmacy;

"(xi) The acceptance back and redistribution of any unused drug, or a part thereof, after it has left the premises of any pharmacy, whether issued by mistake or otherwise.

---

[5] Section 390-8(11) which bars "[a]ny pharmacist or owner of a pharmacy [from] advertising or promoting dangerous drugs, narcotics or drugs containing either by name or prices therefor" was held unconstitutional in *Board of Pharmacy v. Pastor*, 441 Pa. 186, 272 A. 2d 487 (1971).

"(xii) To accept employment as a pharmacist, or share or receive compensation in any form arising out of, or incidental to, his professional activities from any medical practitioner or any other person or corporation in which one or more medical practitioners have a proprietary or beneficial interest sufficient to permit them to exercise supervision or control over the pharmacist in his professional responsibilities and duties;

"(xiii) To accept employment as a pharmacist, or share or receive compensation in any form arising out of, or incidental to, his professional activities from any person who orders said pharmacist, directly or indirectly, to engage in any aspect of the practice of pharmacy in contravention of any provision of this act." Act of September 27, 1961, P. L. 1700, §5(a)(9), 63 P.S. §390-5(a)(9) (footnote omitted).[6]

---

[6] The remainder of Section 390-5 provides as follows:

"(a) The board shall have the power to revoke or suspend the license of any pharmacist upon proof satisfactory to it that:

"(1) His license was procured through fraud, misrepresentation or deceit;

"(2) He has been found guilty, pleaded guilty, or entered a plea of nolo contendere to any offense in connection with the practice of pharmacy or involving moral turpitude before any court of record of any jurisdiction;

"(3) He is unfit to practice pharmacy because of habitual intemperance in the use of alcohol beverages, narcotics, dangerous drugs or any other substance which impairs the intellect and judgment to such an extent as to impair the performance of professional duties;

"(4) He is unfit or unable to practice pharmacy by reason of a physical or mental disease or disability;

"(5) His license to practice pharmacy issued by any other properly constituted licensing authority of any other state has been suspended or revoked;

"(6) He has violated or permitted the violation of any provision of this act or regulation of the board;

"(7) He has engaged in the practice of pharmacy with an unlicensed person or has allowed any unlicensed person to take charge of a pharmacy or engage in the compounding, distribution or dis-

Both parties agree that appellant's conduct did not violate any of the thirteen specific prohibitions constituting "grossly unprofessional conduct" found in Sec-

---

pensing of prescriptions, dangerous drugs or narcotics, except a pharmacy intern in the presence of and under the immediate supervision of a licensed pharmacist;

"(8) He has compounded, dispensed, sold or caused the compounding, dispensing or sale of any drug or device which contains more or less than the proportionate quantity of ingredient or ingredients specified by the person who prescribed such drug or device or which is of a brand or trade name other than that specified by the person prescribing such brand or trade name product or which contains an ingredient or ingredients of a brand or trade name other than that specified by the person prescribing such drug or device, unless the consent of the prescriber is first obtained to each such specific prescription: Provided, however, That nothing herein shall be construed to prevent the addition of such inert ingredients as may be required in the art of compounding, preparing, mixing or otherwise producing drugs or devices.

"(9) . . .

"(b) The board shall have the power to revoke or suspend the permit of any pharmacy upon proof satisfactory to it that:

"(1) The license was procured through fraud, misrepresentation or deceit;

"(2) The holder thereof has violated any of the provisions of this act or regulations of the board applicable to him or any provision of the Drug, Device and Cosmetic Act or the Federal act, or has ordered a pharmacist in his employ to engage in any aspect of the practice of pharmacy in contravention of any provisions of the aforesaid acts or regulations thereunder;

"(3) The holder thereof sold, dispensed or caused or allowed to be sold or dispensed any narcotic drug, dangerous drug or non-proprietary drug, except by a licensed pharmacist;

"(4) The holder thereof, after issuance of a permit, fails to continue to comply with all requirements of Section 4 hereof;

"(5) Upon the suspension or revocation of a license of a pharmacist employed by said person, it is shown that the illegal acts of the pharmacist were within the knowledge or should have been within the knowledge of the permit holder." (Footnotes omitted.) The revocation of appellant's permit based on Section 390-5 (b)(2), also rested on a finding of "grossly unprofessional conduct" in violation of Section 390-5(a)(9).

tion 390-5(a)(9) or any of the other provisions in the Pharmacy Act or any rules or regulations promulgated thereunder or for that matter any other laws of Pennsylvania.[7] The Board nevertheless contends that appellant's conduct was clearly "grossly unprofessional" and that the thirteen specific prohibitions in subsection (9) are not intended to be an exclusive definition but only an exemplary description designed to provide guidance to the Board in determining from case to case the scope of "grossly unprofessional conduct". Appellant argues that "grossly unprofessional conduct" is intended by the Legislature to constitute only the thirteen specific types of conduct enumerated in subsection (9). Appellant urges therefore that a finding that he did not violate any of these provisions or any other provision in the Pharmacy Act including rules adopted thereunder or any other law of Pennsylvania compels the conclusion that the Board exceeded its statutory authority in suspending appellant's license for one year and revoking indefinitely his permit. We agree with appellant's construction of Section 390-5(a)(9) and reverse the order of the Commonwealth Court affirming the adjudication of the Board.

I

Section 390-5 of the Pharmacy Act provides nine separate grounds for suspension or revocation of a license, one of which lists thirteen prohibited forms of conduct and five different grounds for suspension or revocation of a permit.[8] This statutory scheme expresses the legislative intention to provide clear advance notice of the enumerated grounds for imposition of sanctions by the Board. Consistent with this scheme of

---

[7] The Board indicates in its opinion that the sales in question may possibly have violated a Maryland drug paraphernalia law.

[8] See note 6 supra.

detailed and specific notice, the Legislature provided in subsection (9) : "The following acts on the part of a pharmacist are hereby declared to constitute grossly unprofessional conduct of a pharmacist. . . ." Id. §390-5-(a)(9). This declaration is followed by thirteen prohibitions previously set forth. We cannot imagine a more forcefully declared legislative intention to describe with particularity the grounds constituting "grossly unprofessional conduct." The Board has offered nothing to place in doubt this clear legislative intent.[9]

Such a construction of Section 390-5 is further supported by the Legislature's grant of rule-making powers to the Board. Section 390-4(j) empowers the Board: "to promulgate rules and regulations governing standards of practice and operation of pharmacies including, but not limited to, rules and regulations governing the method of advertising, promotion and standards for filling and refilling prescriptions, such regulations to be designed to insure methods of operation and conduct which protect the public health, safety and welfare and prevent practices or operations which may tend to lower professional standards of conduct." Id. §390-4(j). Sections 390-5(a)(6) and (b)(2) both provide for sus-

---

[9] The Board contends that if the thirteen enumerated grounds of "grossly unprofessional conduct" are exclusive, then there was no need for the Legislature to use the term "grossly unprofessional conduct" as a separate ground for suspension and the thirteen grounds could have been added to the eight grounds proceeding subsection (9). We find this argument totally unpersuasive. It is just as logical to argue that all the grounds provided in Section 390-5 constitute "grossly unprofessional conduct" under a general definition of the phrase. The Legislature, however, did not intend the phrase to cover all the grounds in Section 390-5 or grounds unmentioned in subsection (9). Rather, the Legislature used the phrase in one subsection and provided it with a special definition for the purposes of the statute—"grossly unprofessional conduct" constitutes the thirteen enumerated types of conduct listed in subsection (9).

pension or revocation of licenses and permits respectively upon proof of violation of any properly adopted rules or regulations promulgated by the Board.[10] It is only by means of these statutorily granted rule-making powers that the Legislature has empowered the Board to provide additional grounds for sanctions.

## II

The Board's construction of Section 390-5(a)(9), which would permit suspension or revocation of licenses

---

[10] Act of September 27, 1961, P. L. 1700, §§5(a)(6), (b)(2), 63 P.S. §§390-5(a)(6), (b)(2). On October 17, 1962, the Board promulgated regulations relating to "Requirements and Regulations on Standards of Practice" and to "Requirements for Applications for Registration and Permit to Conduct a Pharmacy." On May 27, 1968, rules and regulations were promulgated relating to "Requirements for Pharmacy Intern Certificate."

These rules and regulations were promulgated and adopted prior to the passage of the Commonwealth Documents Law, Act of July 31, 1968, P. L.     , No. 240, art. 1 et seq., §§101 et seq., 45 P.S. §§1101 et seq., which provides, inter alia, for the immediate publication of administrative regulations in the "Pennsylvania Bulletin" to be followed by publication in the "Pennsylvania Code". Section 1402 of the Act provides:

"On or before sixty days after the effective date of this act every agency . . . shall deposit with the bureau . . . a copy certified . . . of:

"(1) All administrative regulations adopted by the agency between February 27, 1962 and September 1, 1963 or, if a deposit of regulations has not heretofore been required of the agency by law or resolution, or effected in compliance therewith, of all unfiled administrative regulations in effect on the effective date of this act, as the case may be, in default of which such administrative regulations shall become invalid. . . ." Id. art. II, §402, 45 P.S. §1402. These rules and regulations were never filed as required with the Legislative Reference Bureau after the effective date of the passage of the Commonwealth Documents Law. Certification of Legislative Reference Bureau to Prothonotary of the Supreme Court, June 5, 1972, on file in that office. These unfiled rules and regulations did not in any way prohibit the sale of the items here involved.

and permits for conduct not specifically defined or prohibited by the statute, would render the statute unconstitutional on grounds of vagueness in violation of the Due Process Clause of the Fourteenth Amendment. The Pharmacy Act clearly indicates the Legislature's intention to specifically define "grossly unprofessional conduct" by means of the thirteen enumerated grounds provided in the statute in order to provide in advance clear notice of what is prohibited conduct and thus avoid vagueness defects. We are also "guided" by the presumption "[t]hat the Legislature does not intend to violate the Constitution of the United States. . . ." Act of May 28, 1937, P. L. 1019, art. IV, §52(3), 46 P.S. §552(3); see *Philadelphia v. Depuy,* 431 Pa. 276, 279, 244 A. 2d 741, 743 (1968); *Milk Control Commission v. Battista,* 413 Pa. 652, 659, 198 A. 2d 840, 843 (1964).

The Supreme Court of the United States has firmly established that "[a] State cannot exclude a person from the practice of law or from any other occupation in a manner that contravenes the Due Process . . . Clause of the Fourteenth Amendment." *Schware v. Board of Bar Examiners,* 353 U.S. 232, 238-39, 77 S. Ct. 752, 756 (1957); *Willner v. Committee on Character and Fitness,* 373 U.S. 96, 102, 83 S. Ct. 1175, 1180 (1963); cf. *Spevack v. Klein,* 385 U.S. 511, 87 S. Ct. 625 (1967). Given the critical consequences including "the loss of professional standing, professional reputation, and of livelihood . . .", *Spevack v. Klein,* 385 U.S. 511, 516, 87 S. Ct. 625, 628 (1967), attending the suspension or revocation of a pharmacist's license and permit, there can be no doubt that the imposition of sanctions under Section 390-5 must satisfy the requirements of notice and clear description of what is prohibited conduct imposed on all penal statutes by the Fourteenth Amendment. See *Schireson v. Shafer,* 354 Pa. 458, 461-62, 47 A. 2d 665, 667 (1946).

"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 127 (1926); accord *Papaschristou v. City of Jacksonville*, 405 U.S. 156, 161-3, 92 S. Ct. 839, 843 (1972); *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S. Ct. 618, 619 (1939). Furthermore, "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey*, 306 U.S. 453, 59 S. Ct. 618, 619 (1939).

We can hardly conclude that the phrase, "grossly unprofessional conduct", in the absence of properly adopted rules or regulations, includes anything more than the thirteen prohibitions enumerated in the statute which is presently the only source of advance notice of what is prohibited conduct. Neither the legislatively chosen agency, here the Board, nor the courts may imagine rules or standards for conduct not properly adopted and announced in advance. To hold otherwise is to substitute for either statute or rule a purely subjective criterion which may reflect merely the personal or professional views of individual members of the Board.

Nevertheless, the Board contends that its duty to "regulate the practice of pharmacy"[11] gives it the power on a case by case basis to "make an ongoing evaluation of what constitutes unprofessional conduct."[12] We believe that such determinations may only be made by statute or rule. The exercise of the Board's power on a

---

[11] Act of September 27, 1961, P. L. 1700, §6(h)(1), 63 P.S. §390-6(h)(1).

[12] Brief for Appellee, p. 17.

case by case basis not based on statute or rule suffers from constitutional infirmities of vagueness.

The Board also maintains that "it is most certainly in the public interest to prohibit men like appellant from providing the means by which drug abuse will grow."[13] Such an objective, no matter how appealing, may not be achieved by procedures which contravene constitutional due proces. As we have previously observed, it is undisputed that appellant's sales of gelatin capsules, lactose and quinine hydrochloride did not violate any of the thirteen statutory grounds of "unprofessional conduct", any other provision in the Pharmacy Act or any properly adopted rules thereunder, nor for that matter any other law of the Commonwealth. "It is scarcely consonant with ordered liberty that the amenability of an individual to punishment should be judged solely upon the sum total of badness or detriment to the legitimate interests of the state which can be found or inferred from a backward looking appraisal of his trial record." Amsterdam, The Void-For-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 81 (1960).

We cannot ignore the constitutional deficiencies inherent in the Board's construction of Section 390-5(a)(9) solely because the trial record may reveal conduct which could be legitimately subject to sanction by the Legislature or the Board of Pharmacy through its statutorily granted rule-making powers. Since the conduct now challenged was not so proscribed, the Board's posture can only be sustained by equating the possession of statutory regulatory authority with the procedurally proper exercise of that authority.

The Board's construction of the statute is also subject to another pernicious defect: "When a statute on its face is vague or overbroad, it at least gives a poten-

---

[13] Id.

tial defendant some notice, by virtue of this very characteristic, that a question may arise as to its coverage, and that it may be held to cover his contemplated conduct. When a statute on its face is narrow and precise, however, it lulls the potential defendant into a false sense of security, giving him no reason even to suspect that conduct clearly outside the scope of the statute as written will be retroactively brought within it by an act of judicial construction. If the Fourteenth Amendment is violated when a person is required to speculate as to the meaning of penal statutes, '. . . or to guess at [the statute's] meaning and differ as to its application,' . . . the violation is that much greater when, because the uncertainty as to the statute's meaning is itself not revealed until the court's decision, a person is not even afforded an opportunity to engage in such speculation before committing the act in question." *Bouie v. City of Columbia,* 378 U.S. 347, 352, 84 S. Ct. 1697, 1702 (1964) ; see *Giaccio v. Pennsylvania,* 382 U.S. 399, 86 S. Ct. 518 (1966).

If we were to accept the Board's construction, we would be improperly construing Section 390-5(a)(9), which is narrow and precise on its face, in such a manner as to make it vague and bring appellant's conduct retroactively within its coverage. This, of course, we cannot do. The function of prohibiting new conduct or practices in the pharmacy profession rests with the Legislature or with the Board through its rule-making authority. See *DePaul v. Kaufman,* 441 Pa. 386, 391-93, 272 A. 2d 500, 503-04 (1971) ; *State Board of Chiropractic Examiners v. Life Fellowship of Pennsylvania,* 441 Pa. 293, 297-98, 272 A. 2d 478, 480-81 (1971) ; *Chartiers Valley Joint Schools v. Allegheny Co. Bd.,* 418 Pa. 520, 527-30, 211 A. 2d 487, 491-93 (1965).[14]

---

[14] Professor Davis recently observed: "Its [the non-delegation doctrine] purpose should be . . . one of protecting against unneces-

## III

Appellant's construction of Section 390-5(9) is in accord with the expressed legislative intent, is constitutionally compelled, and is in harmony with other authority.[15] See, e.g., *Colorado State Board of Medical Ex-*

sary and uncontrolled discretionary power. The focus should no longer be exclusively on standards; it should be on the totality of protections against arbitrariness, including both safeguards and standards. . . . The focus of judicial inquiries thus should shift from statutory standards to administrative safeguards and administrative standards. . . . [T]he protections should grow beyond the non-delegation doctrine to a much broader requirement, judicially enforced, that as far as is practicable administrators must structure their discretionary power through appropriate safeguards and must confine and guide their discretionary powers through standards, principles and rules. The requirement should extend not only to delegated power but also to undelegated power, including especially the extremely important power of selective enforcement which probably engenders more injustice than delegated power. . . ." Davis, A New Approach to Delegation, 36 U. Chi. L. Rev. 713 (1969) ; see also Davis, Discretionary Justice—A Preliminary Inquiry 27-50 (1969) ; Davis, Administrative Law Treatise §§2.01-16 (1958).

Acceptance of the Board's construction of "grossly unprofessional conduct" would create the potential for many of the abuses outlined above including "arbitrariness," "uncontrolled discretionary power" and the dangers of "selective enforcement". Reliance on rule-making powers would minimize these dangers. The statute provides adequate standards. See text accompanying notes 8-9 supra. The rule making procedures and the requirements of publication, see note 9 supra, would provide the requisite advance notice as to what is prohibited conduct.

[15] The Board relies on *Beatty v. State Board of Undertakers*, 352 Pa. 565, 43 A. 2d 127 (1945) and *State Board of Medical Education and Licensure v. Ferry*, 172 Pa. Superior Ct. 372, 94 A. 2d 121 (1953), to support its contentions. In *Beatty* the Court had before it an appeal from the Court of Common Pleas of Dauphin County sitting as the Commonwealth Court which affirmed the revocation of appellant's registration as a student apprentice undertaker by the State Board of Undertakers. Since the statute in question provided that " '[t]he action of said court [of Common Pleas of Dauphin County] shall be final' " the scope of review was

*aminers v. Weiler,* 157 Colo. 244, 402 P. 2d 606 (1965) ; *Louisiana State Board of Embalmers v. Britton,* 244 La. 756, 154 So. 2d 389 (1963) ; contra *Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, 436 P. 2d 828 (1968) ; *Bell v. Board of Regents,* 295 N.Y. 101, 65 N.E. 2d 184 (1946).[16] We agree with the Court in *Weiler* that

---

limited to the "jurisdiction of the court below and the regularity of the proceedings," Id. at 566, 43 A. 2d at 128, rather than "the merits of the controversy." Id; see also *Pa. State Bd. of Funeral Directors v. Errichetti,* 440 Pa. 40, 269 A. 2d 758 (1970) (per curiam).

In *Ferry,* appellant had his medical license revoked on the grounds of "grossly unethical practice" which is not defined in the governing statute. Appellant had been charged and found guilty of permitting an unlicensed assistant to perform the functions of a physician. The Superior Court dismissed the attack on the grounds of vagueness and concluded that appellant's conduct was clearly covered by the statute. *Ferry's* validity is questionable in light of the prior decision of this Court in *Shireson v. Shafer,* 354 Pa. 458, 47 A. 2d 665 (1946), where it was held: "While it is true that such legislation [the Medical Practice Act] is penal in nature and must therefore be strictly construed . . . it is also the general rule that where the license should never have been granted for reasons such as fraud or forgery, the licensing authority has the *inherent power* to revoke it. . . . Respectable opinion . . . supports the principle that where a license, such as this, was procured by fraud, it may be revoked by the licensing authority regardless of the fact that fraud is not specified as a ground for revocation in the statute." Id. at 461-62, 47 A. 2d at 667 (emphasis in original).

16 In *Bell,* where the court of appeals upheld the suspension of a dental license for "unprofessional conduct" which had never been defined by the Legislature or by the Board of Regents through its rule-making power, the court qualified if not overruled a prior decision in *Cherry v. Board of Regents,* 289 N.Y. 148, 44 N.E. 2d 405 (1942). In *Cherry,* the court of appeals reversed a suspension of a dental license because the regulation relied upon banned conduct which had been impliedly sanctioned by the Legislature. The court (Justice LEHMAN) observed: "The Board of Regents cannot, as we have said, suspend or revoke the license of a dentist, for any cause not specified in section 1311, subdivision 2. It cannot ban as unprofessional conduct which has been impliedly sanctioned by the Legislature. Nor can it by regulation ban, as unprofessional,

" 'the Board's authority comes solely from the statute itself and it cannot create new grounds for the revocation of a license' ", *Colorado State Board of Medical Examiners v. Weiler,* 157 Colo. 244, 250, 402 P. 2d 606, 609 (1965), unless, of course, the Board properly makes use of its statutorily granted rule-making powers.[17]

The order of the Commonwealth Court affirming the order of the Board of Pharmacy is reversed.

Mr. Chief Justice JONES took no part in the consideration or decision of this case.

---

conduct which, though not expressly impliedly sanctioned by the Legislature, accords with the standards accepted as proper by the 'consensus of expert opinion'. *Even so there remains a large field in which the Board of Regents may by the exercise of its specific supervisory power 'prescribe canons by which conduct deemed by it, in the exercise of fair judgment, to be unprofessional and objectionable' is banned. . . . In such case the regulation serves to apprise all practitioners of the standards which the official body authorized to supervise the profession deems necessary, and those who choose to disregard the warning do so at their peril.*" Id. at 158-59, 44 N.E. 2d at 412 (emphasis added). We believe that *Cherry,* requiring advance notice either through the statute or by regulations of the Board, states the proper and constitutionally compelled rule of law in these circumstances.

[17] The question more commonly faced in the license suspension or revocation cases is whether or not the rules or regulations of the licensing Board relied upon to justify the Board's action were promulgated in excess of the powers delegated to the Board by the Legislature. See, e.g., *Reyburn v. Minnesota,* 247 Minn. 520, 78 N.W. 2d 351 (1956) ; *Bresler v. Tietjen,* 424 S.W. 2d 65 (Mo. 1968) ; *Texas State Board of Examiners in Optometry v. Carp,* 412 S.W. 2d 307 (Texas 1967) ; cf. *Ladrey v. Commission,* 261 F. 2d 68 (D.C. Cir. 1958) ; *Fountain v. Oelschlegel,* 9 Ariz. App. 236, 451 P. 2d 316 (Ct. App. 1969). We, of course, are not faced with this question here because the Board's rule-making power was not exercised.