Kenneth R. Oppenheim, D.D.S., Steven M. Sloan, D.D.S., Petitioners *v.* Commonwealth of Pennsylvania, Department of State, Bureau of Professional and Occupational Affairs, State Dental Council and Examining Board, Respondents

Argued April 6, 1983, before Judges ROGERS, CRAIG and MACPHAIL, sitting as a panel of three.

*Alan M. Lieberman,* with him, *Susan W. Schneider,
Schnader, Harrison, Segal & Lewis,* for petitioners.

*Jerome, P. Grossi,* Assistant Counsel, with him,
*David F. Phifer,* Chief Counsel, for respondent, State
Dental Council and Examining Board.

OPINION BY JUDGE CRAIG, May 6, 1983:

Dentists Kenneth R. Oppenheim and Steven M.
Sloane appeal from orders of the State Dental Council
and Examining Board which suspended their licenses
for ninety days. We affirm.

Jean Gladfelter Prescott, a registered dental hygienist and former part-time employee of Drs. Oppenheim and Sloane, initiated the complaint process against both dentists in May of 1979, informing Nancy Miller, then a registered dental hygienist active in local, state and national hygienist associations and now a member of the board, that Drs. Oppenheim and Sloane were permitting dental assistants, who were not licensed as dental hygienists, to perform oral prophylaxis. Mrs. Miller informed Mrs. Prescott that she would discuss the matter with Dr. Reuben Miller, her husband and a member of the board. Based upon Dr. Miller's subsequent recommendation, Mrs. Prescott submitted a letter to the board on July 10, 1979, describing the alleged violations.

In December of 1979, the board apparently conducted an informal hearing to consider Mrs. Prescott's allegation; Chairman McDermott and board members Penzur, Vaughters, and Miller, apparently participated.

The board also apparently voted unanimously to convene a formal hearing and, on June 9, 1980, issued citations and notices of hearing prepared by Assistant Attorney General William H. Andring. Each citation charged:

That Respondent as a regular part of his practice and as a part of his office policy, did during 1979 employ and regularly assign persons not licensed as dentists or dental hygienists to perform oral prophylaxis on his patients, in that he allowed said unlicensed persons to remove tartar deposits, accretions, and stains from the exposed surfaces of the teeth and directly beneath the free margin of the gums, and to make application of medicaments to the exposed surfaces of the teeth.

The board held a formal hearing on September 9, 1980; present for the board and participating in the final license-suspension vote were Chairman McDermott and members Penzur, Vaughters, Fox, Jacobson, Petrini, and Clark. Dr. McDermott announced that board members Reuben and Nancy Miller would not participate. Assistant Attorney General Andring prosecuted the case.

Based upon the testimony of Mrs. Prescott and Joseph Garlan, an investigator with the Bureau of Professional and Occupational Affairs who conducted a one-hour undercover investigation of the dentists' clinic, the board found that, among other things, two unregistered dental assistants were performing unsupervised oral prophylaxis, scaling and polishing on a regular basis,[1] and that one of the assistants cleaned investigator Garlan's teeth with an ultra-sonic scaler.[2]

The board concluded that Drs. Oppenheim and Sloane had violated sections 3(i) and 10 of the Dental Law (the Act)[3] and accompanying regulations.[4]

---

[1] Finding of Fact No. 13.

[2] Finding of Fact No. 25.

[3] Act of May 1, 1933, P.L. 216, *as amended*, 63 P.S. §§122(i) and 129.

[4] 49 Pa. Code §§33.1—33.291.

Drs. Oppenheim and Sloane contend that (1) the evidence presented at the hearing is insufficient to sustain the board's suspension order, (2) the Dental Law and its regulations are unconstitutionally vague because the board has failed to define the term "medicaments," as allegedly required by statute, and (3) the procedures followed by the board were violative of the dentists' due process rights because of (a) an alleged commingling of prosecutorial and adjudicative functions by the board and (b) testimony by two board members received at the hearing.

Before we address those issues, we must comment upon the inartful state of the charges brought against both dentists by the Commonwealth and, regrettably, reproduced in the board's conclusions of law. As noted above, the charges accused the dentists of permitting unlicensed personnel "to perform oral prophylaxis . . . in that [they] allowed said unlicensed persons to remove tartar deposits, accretions, and stains . . . and make application of medicaments to the exposed surfaces of the teeth."

We have no doubt that by using the phrase "in that," the board equated "oral prophylaxis" with various elements of the prophylaxis procedure subsequently described. Presumably, by permitting unlicensed personnel to perform any one of the activities which constitutes an element of the oral prophylaxis process, e.g., stain removal from teeth, a dentist would be committing an unlawful act. Nevertheless, the board should draft its charges and conclusions with greater precision, remembering that the responsibility of ultimate review may be borne by persons not educated in dentistry.

## Substantial Evidence

With dental board appeals, we limit our scope of review to determining if the board has committed an

error of law, violated constitutional rights, or failed to support any necessary finding of fact with substantial evidence. Administrative Agency Law, 2 Pa. C. S. §704; *State Dental Council and Examining Board v. Friedman*, 27 Pa. Commonwealth Ct. 546, 549, 367 A. 2d 363, 365 (1976). Weight and credibility of the evidence are solely within the province of the factfinder. *Kundrat v. State Dental Council and Examining Board*, 67 Pa. Commonwealth Ct. 341, 447 A.2d 355, 359 (1982); *Kunkle v. State Dental Council and Examining Board*, 38 Pa. Commonwealth Ct. 254, 257-58, 392 A.2d 357, 358 (1978).

Relying upon *State Board of Medical Education and Licensure v. Grumbles*, 22 Pa. Commonwealth Ct. 74, 347 A.2d 782 (1975), where we rejected lay testimony used by a medical licensure board to revoke a physician's license for alleged drug addiction, Drs. Oppenheim and Sloane contend that we should declare Mrs. Prescott's testimony similarly deficient because her part-time status and her physical vantage point for observation in the office afforded her an inadequate opportunity to determine if the clinic's unlicensed dental assistants were using restricted instruments or performing restricted procedures. Specifically, the dentists contend that Mrs. Prescott's observations were made in passing and from too great a distance to be dependable, that the instruments used by the dental assistants were in the patients' mouths and thus not subject to scrutiny, and that Mrs. Prescott could not determine if the assistants were administering prophy paste, which they may not use lawfully, or amalgloss, which they may.

There is substantial evidence of record, however, to support the board's finding and conclusion that two dental assistants were performing unsupervised oral prophylaxis on a regular basis; Mrs. Prescott testified that (1) as a licensed dental hygienist, she could rec-

ognize the performance of a prophylaxis procedure and that she (2) witnessed the dentists instruct their unlicensed assistants to perform prophylaxis, (3) saw the assistants use an ultrasonic cleaner, scale mouths with scaling instruments, and take a polishing cup and polish teeth, and (4) observed this happening on a regular basis.[5]

Moreover, Investigator Garlan, who made an appointment to have his teeth cleaned, substantially cor-

[5] Mrs. Prescott testified as follows:

A. Okay. I noticed that two of their dental assistants were going into the waiting room, taking patients back to another room, proceeding to take X rays. . .

They then proceeded to take the ultrasonic cleaner, the Cavitron in this case, go through the entire mouth, after which they would take scaling instruments, go through the entire mouth and complete with a polishing.

Q. And, to the best of your knowledge, were any of these people registered dental hygienists?

A. No, they were not.

Q. Okay. The cleanings which you observed these people perform, were these isolated incidents?

A. No, these were happening on a regular basis.

. . . .

Q. Okay. Now, when the people you testified did the prophys, Terry Carchio, Maggie Eckenrode and Suzanne Knauss, perform prophys, did you ever witness the Respondents instructing them to do the prophys?

A. Yes, that they would tell them to go out into the waiting room to take the patient back to the room and do the prophy.

Q. Now, on approximately 60 occasions when you testified you observed these three people doing prophys, how did you know that they were doing prophys as opposed to doing some other procedure?

A. Okay. Well, they would begin by using the ultrasonic cleaner. And, to my knowledge, that is not used for much more than removing calculus and stain and plaque. I have never heard of it being used to polish amalgams. Then they would take their scaling instruments and proceed to scale around the entire mouth. And then lastly they would take the polishing cup and polish the teeth.

roborated Mrs. Prescott's testimony in layman's terms by testifying as follows:

Q. How did you know that she was cleaning your teeth?

A. How did I know? Well, when I did rinse my mouth, particles of dirt would—I would spit out.

Q. Did she indicate to you that she was cleaning your teeth

A. Yes, she said she was going to *clean my teeth with the ultrasonic scaler.* I did not ask her what the machine was.

Q. And she stated it was an ultrasonic scaler?

A. Yes. (Emphasis added.)[6]

Although it is true, as the dentists contend, that one of their unlicensed dental assistants may have been performing an amalgam polishing upon Investigator Garlan's fillings and not an unsupervised oral prophylaxis, the board was free to accept Mr. Garlan's testimony at face value. *Kundrat* at 348, 447 A.2d at 359. Moreover, the board was free to reject the testimony of the dentists' expert witness, Robert G. Clarke, who questioned the ability of a trained dental auxiliary, including a dental hygienist such as Mrs. Prescott, to determine by observation from the clinic hallway the instruments used or procedures performed. *Id.*

Drs. Oppenheim and Sloane also contend that Mrs. Prescott's testimony is inherently suspect because of her employment experience with them. *Grumbles* at 80, 347 A.2d at 786 (board must give consideration to

---

[6] Our own review of the exhibits supports Inspector Garlan's statement that dental assistant Terry Carchio performed oral prophylaxis; the $24 bill which he received and paid describes PRO [defined on the bill as "Prophylaxis (Scale & Polish)"] as part of his treatment.

clear bias or interest of board's principal witnesses). The board considered Mrs. Prescott's potential for bias, recognizing that even though she may have filed her complaint for "unforgiving reasons," she also first notified Mrs. Miller of her concerns *before* the dentists terminated her employment or furnished statements which ultimately resulted in a denial of benefits from the Pennsylvania Unemployment Compensation Board.

### Void for Vagueness

Drs. Oppenheim and Sloane also contend that the provisions used to suspend their licenses are unconstitutionally vague on their face and as applied because the Commonwealth charged both dentists with having permitted unregistered dental auxiliaries to use "medicaments," a term undefined by statute or regulation. Although the statutory and regulatory scheme here invoked by the board is unnecessarily convoluted, it is not unconstitutionally vague.

The board suspended both licenses under section 3(i) and 10 of the Dental Law, 63 P.S. §§122 and 129. In pertinent part, section 3(i) provides that the board "shall have power . . . to suspend . . . the license . . . of any licensee who has been guilty of . . . a violation of any of the provisions of this Act; or of fraudulent or unlawful practices . . . ."

Section 10 describes a host of unlawful practices, two of which are relevant here:

It is unlawful for any person . . . to induce any person to practice dentistry or as a dental hygienist in violation of this Act.

It is unlawful for a person practicing dentistry to employ a dental hygienist as his or her assistant unless such assistant is licensed and registered as a dental hygienist as required by this Act and the rules and regulations of the board.

Section 1 of the Act, 63 P.S. §121, defines a dental hygienist as:

One who is legally licensed as such by the said Dental Council and Examining Board to perform those educational, preventive, and therapeutic services and procedures that licensed dental hygienists are educated to perform. Licensed dentists may assign to their employed dental hygienists intra-oral procedures which the hygienists have been educated to perform and which require their professional competence and skill but which do not require the professional competence and skill of the employer-dentist. Such assignments shall be under the supervision of a licensed dentist. . . . The board shall issue rules setting forth the necessary education and defining the procedures that may be performed by dental hygienists licensed under this Act including those procedures that may be performed under direct and general supervision.[7]

The board has defined the procedures which a dental hygienist may perform by further defining the function in the regulations as follows:

[7] Before the 1972 amendment to section 1 of the Act, 63 P.S. §121, the legislature defined a dental hygienist as follows:

A "Dental Hygienist" is one who is legally licensed as such by the said dental council and examining board to remove tartar deposits, accretions, and stains from the exposed surfaces of the teeth and directly beneath the free margin of the gums, and to make application of medicaments, as defined and approved by the board, to the exposed surfaces of the teeth for the prevention of dental caries, in the office of a dentist or any public or private institutions such as schools, hospitals, orphan asylums, and sanatoriums or State health care, under the general supervision of a licensed and registered dentist, and not otherwise, and who does not perform any other operation of work on the teeth, jaws, gums or mouth whatever.

*Dental hygienist*—One who is legally licensed as such by the Board to remove tartar, deposits, accretions, and stains from the exposed surfaces of the teeth and directly beneath the free margin of the gums and to make application of medicaments as defined and approved by the Board to the exposed surfaces of the teeth for the prevention of dental caries, in the office of a dentist, in any public or private institutions ... or in state health care under the general supervision of a licensed and registered dentist.

49 Pa. Code §33.201.

Scaling, root planing, polishing, or any other procedure required to remove tartar deposits, accretions, and stains from the exposed surfaces of the teeth and directly below the free margin of the gums shall be performed only by a licensed and registered dentist or dental hygienist.

49 Pa. Code §33.214.

The statute does not define the role of an unlicensed dental assistant, referred to in the regulations as an auxiliary. Rather, one must consult section 33.-41 of the Code to determine the extent of the permitted functions:

(a) A legally licensed and registered dentist may delegate to competent auxiliary personnel those procedures for which the dentist exercises direct supervision and full responsibility, except as follows:

(1) Those procedures which require professional judgment and skill such as diagnosis and treatment planning and the cutting of hard or soft tissues, or both, or any intra-oral procedure which would lead to the fabrication of an appliance which when worn by the patient,

would come in direct contact with hard or soft tissue and which could result in tissue irritation or injury.

(2) *Those procedures allocated by the Act to registered dental hygienists.*

(b) Direct supervision shall be interpreted to mean that the dentist must see the patient, assign the work, and check its progress and completion. (Emphasis added.)

In other words, an auxiliary may perform procedures not reserved for the professional expertise of dentists or hygienists.

We must note that the regulations are not perfectly clear. Section 33.41(a)(2) provides that an auxiliary may not perform procedures "allocated by the *Act* to registered dental hygienists"; section 1 of the Act, in turn, refers the practicing dentist back to rules issued by the board. One must then consult the definition of a "dental hygienist" under section 33.201 of the Code—which tracks verbatim section 1 of the Act as originally enacted—to determine that auxiliary personnel may not, among other things, "make application of medicaments as defined and approved by the board," substances which are not defined or approved in the regulations. Given this tortuous draftsmanship, we will treat the dentists' vagueness challenge to the term "medicaments" as a constitutional challenge to the statute, even though it is the board—and not the legislature—which has failed to define the term thus far.

In a void-for-vagueness challenge, a party may assert (1) that the statute is vague on its face, measured against hypothetical conduct that the language could arguably embrace (facial vagueness), or (2) that the language is vague with regard to the particular conduct of the individual challenging the statute (vagueness-as-applied). *Commonwealth v. Mack*, 467

212

Pa. 613, 616-17, 359 A.2d 770, 772 (1976). Absent the assertion of an infringement of first amendment freedoms, however, the specificity of a statute can only be measured on a vagueness-as-applied basis. *Commonwealth v. Heinbaugh*, 467 Pa. 1, 4-5, 354 A.2d 244, 245 (1976). Consequently, because the dentists do not claim an infringement of their first amendment freedoms, we must reject the facial vagueness challenge.

There can be no doubt that the Dental Law is a penal statute. *Snell v. State Dental Council and Examining Board*, 490 Pa. 277, 281, 416 A.2d 468, 470 (1980). Consonant with ordinary notions of fair play and the settled rules of law, the terms of such a statute must be "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Heinbaugh* at 5, 354 A.2d at 246, citing *Connally v. General Construction Co.*, 269 U.S. 385 (1926). "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally* at 391. *See also Cochran v. Commonwealth*, 69 Pa. Commonwealth Ct. 74, 450 A.2d 756 (1982) (adequate notice and non-discriminatory application are standards against which to measure vagueness challenge).

Statutes challenged on the ground of vagueness are not, however, to be tested against paradigms of legislative draftsmanship. *Heinbaugh* at 6, 354 A.2d at 246. Rather, the requirements of due process are satisfied if the statute in question contains reasonable standards to guide prospective conduct. *Id.*

Within the context of the dentists' conduct here, we are certain that a failure to define "medicaments" did not unconstitutionally jeopardize their right to adequate notice of conduct that would render them

liable to penalties under the Act. Even if they did not fully understand the word "medicaments," the regulations also provide that auxiliary personnel may not scale or polish teeth, and there was substantial evidence of record that both dentists permitted their unlicensed assistants to perform these forbidden services. Moreover, the Dental Law addresses a specific audience of professionals who must be held to a standard consonant with their training and expertise. "Medicaments" might force the man of common intelligence to guess at its meaning; that term should pose far less of a problem to dentists already warned by statute and regulation that auxiliary personnel may not perform services requiring professional judgment. Finally, as our Supreme Court noted in *State Dental Council and Examining Board v. Pollock*, 457 Pa. 264, 275-76, 318 A.2d 910, 917 (1974), the regulations provide an official address from which a licensee can obtain further advice concerning matters pertinent to the practice of dental hygiene. *See* 49 Pa. Code §33.-291. If Drs. Oppenheim and Sloane were unclear as to the dividing line between permissible and impermissible auxiliary personnel duties, they should have consulted the board.

## Commingling

Finally, Drs. Oppenheim and Sloane contend that the board violated their due process rights to a fair and impartial tribunal by commingling prosecutorial and adjudicative functions. We disagree.

First, they submit that commingling occurred because Dr. Miller had a substantial prehearing familiarity with Mrs. Prescott's allegations and yet participated in the board's discussions and vote to proceed to a formal hearing. We note, however, that Chairman McDermott recused Dr. and Mrs. Miller from the adjudicative process. Thus, by definition,

there could be no commingling of functions; Dr. Miller participated only in the prosecutorial phase of this case, *i.e.*, by advising Mrs. Prescott to forward her complaint to the board and by participating in the pre-hearing determination of probable cause.

Second, relying primarily upon *Dussia v. Barger,* 466 Pa. 152, 351 A.2d 667 (1975), Drs. Oppenheim and Sloane contend that commingling occurred because Chairman McDermott and members Penzur and Vaughters were allegedly involved in both the prosecutorial determination of probable cause and the adjudicative determination of guilt.

The dentists' reliance upon *Dussia* is misplaced. Following the Pennsylvania Supreme Court's lead, our court has recognized a fundamental distinction between the danger of conjoining prosecutorial and adjudicative functions in a single individual, and the danger of commingling such functions in an administrative structure statutorily designed. Thus, as a general rule, a decision made by a tribunal after a formal adversarial hearing, where that tribunal has generally supervised an investigation into the same matter previously, or made a pre-hearing determination of probable cause, is not per se an adjudication rendered by a biased tribunal, as long as the prosecutorial and investigatory aspects of the matter are adequately separated from the adjudicatory function. *Appeal of Redo,* 42 Pa. Commonwealth Ct. 468, 471-72, 401 A.2d 394, 396 (1979) citing *Bruteyn Appeal,* 32 Pa. Commonwealth Ct. 541, 380 A.2d 497 (1977). In such cases, a party claiming due process violations must show actual bias. *Id.* As the United States Supreme Court noted in *Withrow v. Larkin*:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more dif-

ficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented. 421 U.S. 35, 47 (1975). *See also Vandergrift Borough v. Polito*, 407 Pa. 286, 288, 180 A.2d 215, 215 (1962) (applying "possibility of bias" standard where agency functions are adequately separated would overlook purpose of judicial and quasijudicial proceedings as well as ability of honest men to perform duty required of them as normal human beings endowed with intellect and reason).

The *Dussia* standard applies only when a single individual commingles prosecutorial and judicial functions; in such cases, the mere appearance of possible prejudice renders the adjudication unconstitutional. *Bruteyn* at 548, 380 A.2d at 501.

As *Pollock, Redo* and *Bruteyn* demonstrate, we cannot reverse the board's order merely because Drs. Miller, Penzur and Vaughters made the initial decision to proceed to final hearing and then sat as members of the formal hearing tribunal.[8]

---

[8] Although the board made no findings of fact concerning the delegation of prosecutorial and adjudicative functions here, our Supreme Court noted in Pollock that, upon receipt of a complaint, the board transmits that complaint for investigation to the Law Enforcement Bureau of the Commission of Professional and Occupational Affairs, a distinct administrative entity within the Pennsylvania Department of State. The legal office of that Commission then determines from the investigation if the complaint warrants a hearing; if so, an assistant attorney general in the Legal Office drafts a citation. 457 Pa. 264, , 318 A.2d 910, 914.

Finally, Drs. Oppenheim and Sloane contend that the board violated their due process rights by permitting Dr. and Mrs. Miller to testify before their peers, thereby allegedly eliminating any "objective appearance of impartiality" at the hearing, *Roberts v. Bailar*, 625 F.2d 125 (6th Cir. 1980). They also contend that board member Penzur exhibited actual bias by taking offense at counsel's cross-examination questions of Dr. Miller. We disagree.

A review of the Millers' testimony reveals that the prosecutor called them before the board only for the purpose of establishing the extent of their involvement in the proceedings; he did not seek their opinions as to the truth of Mrs. Prescott's charges. Moreover, by recusing the Millers from the final decision-making process, the board avoided even the appearance of impropriety.

The dentists' claim of actual bias stems from a reaction by board member Dr. Penzur to questioning by the dentists' attorney apparently intended to suggest the existence of a recused board member's actual bias:

Q. Were you aware, Dr. Miller, at the time that you participated in that [preliminary hearing] vote, which I believe was December of last year . . . of an Andrew Truax, T-r-u-a-x?

A. You mean did I know such a person at the time I rendered that decision?

Q. Yes.

A. Yes, I did.

Q. He was a patient of yours, is that correct, sir?

A. That's correct.

. . . .

Q. Are you aware that he is now a patient of Dr. Sloane and Dr. Oppenheim?

---

Absent proof of irregularities, we must assume that the board properly severed the prosecutorial and adjudicative functions here.

A. I am.

Q. Were you aware at the time, sir, that you rendered that decision?

A. No.

At the conclusion of cross-examination, Dr. Penzur remarked:

I would like to make a statement for the Board. As the senior member of this Board as it is presently constituted and having served my ninth year at considerable economic cost, I object to the accusation that suggests that perhaps Dr. Miller would be vindictive in this instance.

Dr. Penzur's reaction may have been unnecessary, but it does not suggest the existence of a biased attitude toward Drs. Oppenheim or Sloane. *Cf. Dayoub v. State Dental Council and Examining Board,* 71 Pa. Commonwealth Ct. 621, 453 A.2d 751 (1982) (board's obvious partiality and hostility vitiates fairness of hearing).

Accordingly, we affirm.

ORDER

Now, May 6, 1983, the order of the State Dental Council and Examining Board, 79-DE-1615, is affirmed.