William E. WATKINS,
D.D.S., Petitioner,

v.

STATE BOARD OF DENTISTRY,
Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 5, 1999.
Decided Nov. 8, 1999.

Carl A. Solano, Philadelphia, for petitioner.

Judith Pachter Schulder, Harrisburg, for respondent.

Before PELLEGRINI, J., KELLEY, J., and NARICK, Senior Judge.

PELLEGRINI, Judge.

William E. Watkins, D.D.S. (Dr. Watkins) petitions for review of an order of the State Board of Dentistry (Board) suspending his dental license and permit to administer analgesia upon finding that he engaged in unprofessional conduct under Section 4.1 of the Dental Law (Act), Act of May 1, 1933, P.L. 216, *as amended*, 63 P.S. § 120–130i [1] and implementing regulations for, *inter alia*, failing to ensure that his office contained "appropriate monitoring equipment" for the administration of general anesthesia in his office.

Dr. Watkins, a family dentist who was first licensed to practice dentistry in Pennsylvania on June 22, 1966, is the holder of a Restricted II permit which allows him to administer nitrous oxide/oxygen analgesia for purposes of sedating patients, but does not permit him to administer general anesthesia. To administer general anesthesia to his patients in his office, Dr. Watkins retained the services of Joseph Mazula, D.D.S, (Dr. Mazula), an oral surgeon, who is licensed to administer general anesthesia. In connection with their agreement, Dr. Mazula also listed Dr. Watkins' office as a branch office and had a permit to that effect. At the beginning of their professional relationship in 1980, Dr. Watkins informed Dr. Mazula that he would supply Dr. Mazula with any and all equipment needed to administer general anesthesia to his patients and that he would rely on the expertise of Dr. Mazula to request any additional equipment needed to administer general anesthesia. Dr. Mazula requested and was supplied with a Flurotech machine and other ancillary supplies.

On March 5, 1996, the Walskis brought their 3½-year-old son Jonathan to Dr. Watkins' office for a dental examination which revealed that Jonathan had four deep cavities that needed to be filled. Because Jonathan was reluctant to open his mouth and had trouble sitting still during the examination, Dr. Watkins and the Walskis agreed to use general anesthesia on Jonathan to sedate him during that procedure. On May 1, 1996, the Walskis returned with Jonathan to have his cavities filled. Upon their arrival, Jonathan was taken back to

---

1. Section 4.1 of the Act provides:
   (a) The Board shall have authority, by majority action, to refuse, revoke or suspend the license of any dentist or dental hygienist or certificate of an expanded function dental assistant for any or all of the following reasons:
   
   ❖  ❖  ❖
   
   (8) Engaging in unprofessional conduct. For purposes of this clause (8), unprofessional conduct shall include any departure from or failure to conform to the standards, acceptable and prevailing dental or dental hygiene practice and standard of care for expanded function dental assistants in which proceeding actual injury to the patient need not be established.
   *Added by* Act of December 20, 1985, P.L. 513, *as amended,* 63 P.S. § 123.1(a)(8).

the treatment room where Dr. Mazula administered the general anesthesia, Halothane, to him. Once Jonathan was unconscious, his parents returned to the waiting room and Dr. Watkins was informed that Jonathan was ready.

While Dr. Watkins began working on the right side of Jonathan's mouth, Dr. Mazula continued to monitor Jonathan's condition by using the following method: placing two fingers on his right hand on Jonathan's carotid artery; watching his chest rise and fall; watching the float valve in the nose piece of the anesthesia hookup, checking Jonathan's pupils and maintaining an airway. After Dr. Watkins finished the right side, Dr. Mazula shifted the mouth prop and the throat shield used in administering the anesthesia from the left side of Jonathan's mouth to the right side. Immediately after shifting the equipment, however, Dr. Mazula could neither detect a pulse at Jonathan's carotid artery nor hear a heartbeat. Dr. Mazula immediately began CPR and instructed one of his assistants to retrieve the office emergency kit. Approximately 1 to 2 minutes later, the receptionist called 911 while Dr. Mazula gave Jonathan what he believed to be a sublingual shot of ephedrine, and began doing chest compressions. Dr. Watkins took over the chest compressions until the paramedics arrived. Jonathan was taken to a nearby hospital where he was pronounced dead.

On June 30, 1997, the Bureau of Professional and Occupational Affairs filed an Order to Show Cause against Dr. Watkins, which was later amended, alleging twenty-one violations of the Act and the implementing regulations. The three charges relevant to the present appeal are that Dr. Watkins:

1) failed to have "appropriate monitoring equipment" as required by Section 340(a)(2) of the Board's regulations, 49 Pa.Code § 33.340(a)(2), for the administration of general anesthesia;

2) failed to give written notice and certification to the Board of the first time anesthesia was administered in his office as required by Section 341 of the regulations, 49 Pa.Code § 33.341; and

3) failed to properly record a patient's complaints as required by Sections 209(a)(3) and 209(h) of the Board's regulations, 49 Pa.Code § 33.209(a)(3), (h).[2]

Dr. Watkins denied the above allegations contending he relied on Dr. Mazula to administer general anesthesia and advise him of all the equipment that was necessary to administer general anesthesia, that the regulations are unconstitutionally vague, and the notice requirements did not apply to him because the use of anesthesia in his office pre-dated the regulations.

At the hearings before the Board, the Commonwealth presented the testimony of two dentists—one an unrestricted permit holder, and another who was, like Dr. Watkins, a Restricted II permit holder. They both testified as experts that appropriate monitoring equipment requires at a mini-

---

**2.** Section 209(a)(3) provides:

(a) A dentist shall maintain a dental record for each patient which accurately, legibly and completely reflects the evaluation and treatment of the patient. A patient dental record shall be prepared and maintained regardless of whether treatment is actually rendered or whether a fee is charged. The record shall include, at a minimum, the following:

\* \* \*

(3) A description of the patient's complaint, symptoms and diagnosis.

Section 209(h) provides:

A dentist's failure to comply with this section will be considered unprofessional conduct and will subject the noncomplying dentist to disciplinary action as authorized in section 4.1(a)(8) of the act.

mum, a pulse oximeter, a blood pressure apparatus, stethoscope and an EKG machine. Regarding the specificity of the regulations, the Commonwealth introduced the testimony of Eli Stavisky, D.M.D., who was Chair of the State Board of Dentistry when the regulations were drafted, and who stated that they purposely were written not to contain a list of monitoring equipment so as not to restrict licensees in the event of advances in technology.

In response, Dr. Watkins testified that at the beginning of his professional relationship with Dr. Mazula, he told Dr. Mazula that he would supply him with any equipment he needed with respect to the administration of anesthesia.[3] Dr. Watkins also stated that he was not familiar with the equipment needed to administer general anesthesia and thus relied on Dr. Mazula without question to determine what equipment was needed for him to administer general anesthesia to the patients in the office. Regarding the notice and certification requirements, Dr. Watkins stated that although he did not provide the Board with written notice, he notified the Board by telephone prior to the first time anesthesia was administered. He also suggested that he was relieved of the notice and certification requirements because Dr. Mazula maintained a branch office license on his premises and was the one responsible for ensuring the proper notice and certification were met to administer general anesthesia at his premises.

The Board found that Dr. Watkins had engaged in unprofessional conduct subject to disciplinary action under Section 4.1 of the Act because he had not complied with the regulations by failing to have "appropriate monitoring equipment," not giving notice prior to the first time general anes-

thesia was used in his office, and failing to properly record complaints. More specifically, while the Board found that Dr. Watkins was partially justified in relying on Dr. Mazula regarding the equipment needed to administer general anesthesia, Dr. Watkins needed to do independent studies to ensure that the monitoring equipment was, in fact, sufficient. Relying on the testimony of the Commonwealth's experts who stated that at the very least, Dr. Watkins' office should have contained an EKG machine and a pulse oximeter, the Board found that he did not have the "appropriate monitoring equipment." It also found that that "appropriate monitoring equipment" was not unconstitutionally vague, but was left open to interpretation so that "licensees would not be restricted in the event of advances in technology." With respect to the notice requirement, the Board disagreed with Dr. Watkins' assertion that he was in effect, "grandfathered in" from giving notice and was required to give appropriate notice to the Board. Finally, the Board concluded that Dr. Watkins failed to adequately record the Walskis' complaints. The Board then imposed a three-year suspension on Dr. Watkins with the first eighteen months being an active suspension and the final eighteen months a probationary period. This appeal by Dr. Watkins followed.[4]

## I.

Dr. Watkins' initial contention is that the Board's regulation requiring "appropriate monitoring equipment" is unconstitutionally vague because it does not give notice to the practitioner of what equipment will be considered appropriate. A statute or regulation[5] that is vague is un-

3. Dr. Watkins' partner, Dr. Kresge, echoed that statement, reiterating that they would purchase any equipment requested by Dr. Mazula at any time.

4. Our scope of review is limited to a determination of whether constitutional rights were violated, and whether the decision is in accordance with law and supported by substantial

evidence. *McGrath v. State Board of Dentistry*, 159 Pa.Cmwlth. 159, 632 A.2d 1027 (1993).

5. An administrative regulation is treated as a statute in instances where the regulation is attacked as being void for vagueness. *See Commonwealth v. Stein*, 519 Pa. 137, 546

constitutional because it either traps the innocent by failing to give a person of ordinary intelligence reasonable opportunity to know what is prohibited so that he may act accordingly or result in arbitrary and discriminatory enforcement in the absence of explicit guidelines for its application. *Blanco v. State Board of Private Licensed Schools,* 718 A.2d 1283 (Pa. Cmwlth.1998). To not be unconstitutionally vague, terms of the statute or regulation must be sufficiently specific to inform those who are subject to it what conduct on their part will render then liable to its penalties. *Oppenheim v. State Dental Council and Examining Board,* 74 Pa. Cmwlth. 200, 459 A.2d 1308 (1983). A statute that forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process. *Id.* Only if the statute contains reasonable standards to guide prospective conduct does it satisfy the requirements of due process. *Id.*

Illustrating an application of these principles is our Supreme Court's decision in *State Board of Pharmacy v. Cohen,* 448 Pa. 189, 292 A.2d 277 (1972), which dealt with a constitutional challenge as to whether a pharmacist had engaged in "grossly negligent conduct." In that case, even though the Pharmacy Board agreed that the pharmacist did not engage in any of the thirteen specifically enumerated actions or inactions that would constitute "grossly unprofessional conduct" under Section 5 of Pharmacy Act,[6] it nevertheless concluded that the pharmacist engaged in "grossly unprofessional conduct." The Pharmacy Board reasoned that because it had the duty to regulate the practice of pharmacy, it had the power, on a case by case basis, to "make an ongoing investigation as to what constitutes unprofessional

conduct." In rejecting the opportunity to expand the term "grossly unprofessional conduct" beyond the statutory definition, our Supreme Court explained:

> Neither the legislatively chosen agency, here the Board, nor the courts may imagine any rules or standards of conduct not properly adopted or announced in advance. To hold otherwise is to substitute for either statute or rule a purely subjective criterion which may reflect merely the personal or professional views of individual members of the Board.

*Id.* at 200, 292 A.2d at 282.

Likewise, this Court in *Blanco v. State Board of Private Licensed Schools,* 158 Pa.Cmwlth. 411, 631 A.2d 1076 (1993), held that the term "other service occupation" in Section 2 of the Private Licensed School Act[7] was unconstitutionally vague as it was applied by the Board of Private Licensed Schools to force Blanco to comply with the statute. There, the Board decided that the exemption from the licensing requirements under the Act for "other service occupations" did not apply to Blanco's school offering bartending training classes. We reasoned that the term "other service occupations" was required to be defined before the Board could require that Blanco's school required licensing, even though the Board was charged with discretion to determine licensing requirements, because the statute did not afford Blanco a reasonable opportunity to know that his school needed licensing.

Again, in *Pennsylvania Bar Association v. Commonwealth,* 147 Pa.Cmwlth. 351, 607 A.2d 850 (1992), we found a provision unconstitutionally vague where the meaning could not be discerned from its language. In that case, we found that Section 1822 of the Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. § 1822, re-

---

A.2d 36 (1988) *cert. denied,* 490 U.S. 1046, 109 S.Ct. 1953, 104 L.Ed.2d 422 (1989).

**6.** Act of September 27, 1961, P.L. 1700, *as amended,* 63 P.S. § 390–5.

**7.** Act of December 15, 1986, P.L. 1585, *as amended,* 24 P.S. § 6502.

quiring any insurer to report "suspected fraudulent claims" to the Index Bureau, including an identification of the claimants and their attorneys, to be unconstitutionally vague because the term "suspected fraudulent claims" was not defined. We reasoned that because the statute failed to provide an attorney of ordinary intelligence a reasonable opportunity to know what was prohibited or provide those who must report the violations any guidance and explicit standards, the reporting requirements were unconstitutionally vague.

■ Applying the principles of the above cases to the present case, we agree that the term "appropriate monitoring equipment" is unconstitutionally vague because it does not provide a reasonable standard by which Dr. Watkins was supposed to act. The term "appropriate monitoring equipment" is not defined in the regulation and what is " appropriate" is subject to many different meanings. As the Board has admitted, it was purposely not defined so that "licensees would not be restricted in the event of advances in technology." The lack of clear guidance as to what constitutes "appropriate" monitoring equipment leads directly to the result our Supreme Court warned about in *Cohen, supra,* where standards are left to be defined by the "personal or professional views of individual members of the Board." That scenario is borne out here where the Board was forced to rely on the opinion of experts to determine what constituted "appropriate monitoring equipment" for its own regulation, yet sought to punish Dr. Watkins for relying on the opinion of another unrestricted permit holder, Dr. Mazula, as to what equipment was "appropriate."

## II.

Dr. Watkins also contends that the Board erred in finding that he failed to comply with the notice provisions contained in 49 Pa.Code § 33.341 requiring that notice be given prior to the first time general anesthesia was used in his office. That section provides:

(a) Effective January 9, 1990, a dentist who does not possess a permit issued under this subchapter may not allow general anesthesia, conscious sedation or nitrous oxide/oxygen analgesia to be administered on an outpatient basis in his dental office unless the following conditions are met:(1) The board receives prior notice of the first time that the dental office will be used for the administration of general anesthesia, conscious sedation, or nitrous oxide/oxygen analgesia.

He contends that the Board erred because he had been using general anesthesia in his office for eight years before the regulation took effect, making it impossible for him to give advance notice of the first time general anesthesia was used in his office. Alternatively, he argues that he gave notice by telephone, which should have been considered sufficient because written notification was not required by the regulations.[8] The Board, however, interpreted this regulation to mean that all dentists were required to give notice of the first time that general anesthesia was administered in the dentist's office after the effective date of the regulation.

■ We disagree that any of the reasons proffered by Dr. Watkins exempted him from complying with the notice requirement contained in the regulation. Initially, we point out that even though there may be a better interpretation, an administrative agency's interpretation of its own regulation is entitled to great deference and will not be disturbed unless it is clearly erroneous. *UGI Utilities, Inc. v. Pennsylvania Public Utility Commission,*

8. The Board also found that Dr. Watkins failed to certify in writing that his office met the equipment and facility requirements of Section 340(a)(2) as required by 49 Pa.Code § 33.341(a)(2). Because we have decided that the term "appropriate monitoring equipment" is too vague to provide reasonable standards of conduct, Dr. Watkins could not have also certified that his equipment was appropriate.

677 A.2d 882 (Pa.Cmwlth.1996). In the absence of a clause exempting from the notice requirements those who administered anesthesia prior to the effective date of the regulations or that they applied only to new practitioners, we agree that the Board's interpretation that the regulations apply to all dentists upon becoming effective is a reasonable interpretation of that regulation. Much like an attorney who is required to keep abreast of publications to the bar and recent changes in the local rules of court and is bound by those changes, *see Toczylowski v. General Bindery Co.*, 359 Pa.Super. 572, 519 A.2d 500 (1986), Dr. Watkins also was required to keep informed of the new requirements in his profession, including the notice requirements at issue here. Because the Board's interpretation of this provision is reasonable and not clearly erroneous, Dr. Watkins was required to give notice the first time he used general anesthesia in his office after the effective date of the regulation. *See Centennial School District v. Department of Education*, 94 Pa.Cmwlth. 530, 503 A.2d 1090 (1986), *affirmed*, 517 Pa. 540, 539 A.2d 785 (1988). Finally, we need not address Dr. Watkins' argument that the regulation does not mandate that he notify the Board in writing of the first time he administered anesthesia in his office because the Board found his assertion that he orally notified the Board not credible. Because there is substantial evidence to support its finding that Dr. Watkins failed to give the required notice, the Board did not abuse its discretion in finding that he violated the regulation.[9]

### III.

■ Finally, Dr. Watkins contends that the Board's findings that he failed to prop-

erly record the Walskis' complaints is not supported by substantial evidence because Dr. Watkins noted on Jonathan's chart that he must check Jonathan's teeth for cavities. Relying on the testimony of a Commonwealth expert that Dr. Watkins did not adequately record the complaints of the Walskis regarding Jonathan, the Board found that Dr. Watkins should have either recorded the Walskis' complaint that Jonathan had black spots on his teeth or recorded "no complaints" on Jonathan's record. Moreover, it stated that while Dr. Watkins recorded Jonathan's cavities, such an activity constituted a diagnosis which is a separate recording requirement. Because the Board's finding that Dr. Watkins failed to properly record the Walskis' initial complaints is supported by the record and what is a proper record is within the Board expertise, we will not disturb that finding on appeal.[10]

Accordingly, because we find that the Board improperly included as a component of the discipline imposed on Dr. Watkins the failure of his office to contain "appropriate monitoring equipment," we vacate the order of the Board and remand the case for the imposition of reasonable sanctions based only on the remaining violations. Jurisdiction is relinquished.

### *O R D E R*

AND NOW, this 8th day of November, 1999, the order of the State Board of Dentistry in the above-captioned matter is vacated and the matter is remanded to the Board for the imposition of discipline and/or sanctions consistent with the fore-

---

**9.** Dr. Watkins did argue before the Board that he should be relieved from compliance with the notice and certification requirements in the regulations because Dr. Mazula held a branch office permit for the premises, and, therefore, he should be the one responsible for notifying the Board prior to the first use of general anesthesia. He did not, however, brief that issue before this Court, and, thus, the issue has been abandoned. *Common-*

*wealth v. Dougherty*, 351 Pa.Super. 603, 506 A.2d 936 (1986) (issues not briefed are abandoned).

**10.** As a result of Dr. Watkins' failure to properly document the complaints, the Board imposed a requirement that Dr. Watkins obtain eight hours of continuing education in risk management to resolve his charting errors.

going opinion. Jurisdiction is relinquished.